[Crim. Nos. 5923, 5924. Fifth Dist. Mar. 4, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS RODNEY TALKINGTON, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Parts II and III are not published, as they do not meet the standards for publication contained in rule 976(b), California Rules of Court.

COUNSEL

Jin Ishikawa, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Paul V. Bishop and Thomas R. Yanger, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ZENOVICH, Acting P. J.—Thomas Rodney Talkington appeals from a finding of the Fresno County Superior Court that, while serving a nine-month term in the Fresno County jail as a condition of probation in two cases, he violated the terms of probation by possessing a firearm while confined in jail, a violation of Penal Code section 4574. The facts relating to this violation of probation are found below.

FACTS

David Mills, a correctional officer assigned to the Fresno County jail, testified that jail officials received information that there was a gun in appellant's cell. On June 16, 1981, at approximately 8 or 8:30 a.m., Mills and other officers conducted a search of the cell.

A box was located on the floor near the foot of the bed. Inside the box were, inter alia, a letter addressed to appellant and two other items. The first item was a rolled up piece of paper approximately 11 to 12 inches long secured with Scotch tape. It was open at both ends.

The second item is the subject of this appeal. Mills described the item as a tightly rolled tube of paper. One end had been closed with melted plastic. There was a hole in the tube near the closed end. Thirty matchheads were found in the tube.

David Juarez was called to the stand. He had been in custody on June 16. Juarez testified he did not see appellant in possession of a rolled-up tube during the month of June. He acknowledged speaking with a detective but stated he told him he did not know to whom the gun belonged and did not recall telling the officer that he saw a homemade gun in appellant's hands.

Robert Johansen, a detective with the Fresno County Sheriff's office, testified he contacted Juarez on June 17. His purpose was to determine if Juarez had any information regarding the search. Johansen testified that Juarez told him appellant owned both items. The "long skinny one" was used as a spitball gun to shoot spitballs at a gay inmate in the next cell. The other one was a homemade gun owned by appellant. A "white dude" had helped appellant make it.

Appellant had told Johansen the first item was a spitball shooter. Appellant denied having seen the "gun" before.

Johansen was asked how the gun worked. The defense attorney objected on the ground of lack of foundation for the witness' qualifications. His qualifications were established. Johansen stated he had been dealing with handguns for 25 years. His training had included disassembling and assembling weapons. He had hunted all his life and was a sniper expert on the SWAT team.

Johansen was familiar with literature regarding homemade weapons. Bulletins issued by the training division of the sheriff's office and the Department of Justice described similar type weapons using the same principle to fire. Johansen had seen at least two or three of these bulletins and had reviewed them personally.

As a qualified expert, Johansen explained the principle of the device: "The basic principle is the exact same as the old cannons that were ever first made. You have a tube. You put the powder inside them, you pack the powder in there. You put a projectile in there, you pack it up to the powder. And you touch it off through this hole in the top and it will shoot a projectile." Projectiles could include melted-down plastic pens, balls made out of tinfoil, and broken up pieces of plastic.

No projectiles were found. The device had not been fired. No one had ever tried to fire it. Johansen had not seen a similar object in the Fresno County jail before.

## DISCUSSION

### I

Appellant first contends that the Legislature never intended to classify such an object as a firearm under Penal Code section 4574. Moreover, he argues this classification overstretches the definition of a firearm. We disagree.

Penal Code section 4574, subdivision (a), reads in relevant part: "Except when otherwise authorized by law, or when authorized by the person in charge of the prison or other institution referred to in this section or by an officer of the institution empowered by the person in charge of the institution to give such authorization, . . . any person who, while lawfully confined in a jail or county road camp possesses therein any firearm, deadly weapon, or explosive, tear gas or tear gas weapon, is guilty of a felony and punishable by imprisonment in the state prison for two, three, or four years."

■ The purpose of this section and other sections proscribing possession of weapons in detention facilities (Pen. Code, § 4502) is to protect inmates and correctional officers from the danger of armed assault. (*People* v. *Superior Court (Gaulden)* (1977) 66 Cal.App.3d 773, 778 [136 Cal.Rptr. 229]; *People* v. *Rodriquez* (1975) 50 Cal.App.3d 389, 395 [123 Cal.Rptr. 185]; *People* v. *Wells* (1968) 261 Cal.App.2d 468, 478-479 [68 Cal.Rptr. 400].) These sections were designed to proscribe inmates from possessing tangible items capable of use for armed attack and posing a threat to jail security. (*In re Jordan* (1974) 12 Cal.3d 575, 579, fn. 5 [116 Cal.Rptr. 371, 526 P.2d 523].) "The statute represents an attempt by the Legislature to keep pace with man's developing capacity to inflict serious harm, a problem compounded by inmate ingenuity engendered by forced idleness." (*People* v. *Rodriquez, supra,* 50 Cal.App.3d 389, 399.)

"Section 4574 proscribes possession, not use, as noted above. Therefore, the statute is concerned with the potential of the item in question. Reading the statute as a whole, it is evident the Legislature enacted no halfway measure. Effective protection of inmates and officers from armed attack depends upon prohibition of possession of *all* deadly weapons in jail. (Cf. *People* v. *Satchell, supra,* 6 Cal.3d [28] at p. 42 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383].) This valid legislative objective does not except weapons with dangerous capabilities which also have innocent uses. Speaking in regard to section 4502, *People* v. *Wells, supra,* 261 Cal.App.2d at pages 478-479 noted the statute '. . . serves an objective demanding relative inflexibility and relatively strict liability. . . . It is one of the "stringent statutes governing prison safety." (*People* v. *Romo* (1967) 256 Cal.App.2d 589, 595 [64 Cal.Rptr. 151].)' The same may be said of section 4574." (*Id.,* at p. 396, italics in original.)

■ The elements of this particular offense relevant to the instant case are taken from the statute: (1) possession (2) of a firearm, deadly weapon, or explosive, (3) without authorization, (4) by one lawfully committed to a county jail. (See *People* v. *Rodriquez, supra,* 50 Cal.App.3d at p. 395.) There is no requirement of specific intent, i.e., the prosecution does not have to show the defendant intended to use the object in a violent manner. (*Id.,* at p. 396; *People* v. *Seale* (1969) 274 Cal.App.2d 107, 112 [78 Cal.Rptr. 811].)

■ The only element at issue is whether the device is a "firearm" within the meaning of the statute. We think it is for the following reasons.

First, we believe Penal Code section 12001 sheds some light on the Legislature's intendment with respect to firearms. It reads in relevant part: " '[P]istol,' 'revolver,' and 'firearm capable of being concealed upon the person' shall apply to and include any device, designed to be used as a weapon, from which is expelled a projectile by the force of any explosion, or other form of combustion, and which has a barrel less than 12 inches in length. . . ."

Although there is no indication of the length of this device, this requirement relates only to statutes which deal with firearms capable of being concealed upon the person. (See *People* v. *Heffner* (1977) 70 Cal.App.3d 643 [139 Cal.Rptr. 45].) Otherwise, the device fits the remaining elements. It can be inferred from the record that appellant intended to use the device as a weapon. The record shows it was designed to expel a projectile by igniting the accumulation of matchheads. As the trial court said, "It's difficult to see what, uh, [the device] would have been used for other than for propelling some kind of missile or other object."

Appellant argues that if this device can be classified as a firearm, then so can any tube sealed at one end. This is not the case before us. Instead, we have a tube sealed at one end, loaded with approximately 30 matchheads, and a hole near the sealed end designed for igniting the matchheads. Clearly, as the officer opined, the principle of the device was that of the old-fashioned cannon designed to propel some type of missile.

Appellant further contends that Penal Code section 4574 does not apply because there was no showing the device would work or could injure someone. We are not persuaded.

In *People* v. *Carter* (1981) 117 Cal.App.3d 546 [172 Cal.Rptr. 838], a case where the defendant brought a gun into the jail, the court was faced with the issue whether Penal Code section 4574 required a finding that the handgun was operable. The Second District held that the defense of inoperability was to no avail: "The clear intent of the Legislature in enacting Penal Code section 4574 was to maintain the safety and security of this state's jails and road camps by totally proscribing the introduction therein of any firearms, deadly weapons or explosives. Here, as with the statute considered in *People* v. *Jackson* (1979) 92 Cal.App.3d 899, 902 [155 Cal.Rptr. 305], 'In our view the legislative intent would be frustrated by the "inoperability defense" proposed by appellant.'

"It requires no imagination to picture the perils created by escaping convicts who are armed with what appear to be functional firearms, or the bloody riots

that often ensue when such efforts prove only partially successful. Manifestly we cannot subject other inmates, their visitors or the guardians of our places of confinement, to risks created by gun wielding prisoners. It would, therefore, be a most unreasonable interpretation of section 4574 that would declare a detected smuggler immune from prosecution if there existed a flaw in the weapon's firepower." (*Carter, supra,* at pp. 550-551, fn. omitted.)

*Carter* is not distinguishable merely because it involved a device that is a traditional firearm and recognizable as such. The theory behind *Carter* quite obviously is that a prison guard cannot distinguish an operable firearm from an inoperable one when it is held to his head. In the case at bench, the detective was aware of homemade weapons through training bulletins. Presumably, guards are even more aware of these weapons through their training and daily contact with convicts. When held to his head, a guard will recognize the device as being a homemade weapon and he would have no reason to believe it is inoperable. Thus, the potential perils of escaping convicts who are armed with what appear to be functional firearms are present in the instant case just as in *Carter*. (Cf. *People* v. *Nelums* (1982) 31 Cal.3d 355 [182 Cal.Rptr. 515, 644 P.2d 201].)

Moreover, policy considerations require that the device be considered a firearm. As noted by the cases, Penal Code section 4574 is a stringent statute governing prison safety and serves an objective demanding relative inflexibility and relatively strict liability to problems compounded by inmate ingenuity. Here we have an inmate who is displaying his creativity in constructing a functional firearm. To wait until its effectiveness has been demonstrated would be ludicrous.

Having concluded the device is a "firearm" within the meaning of Penal Code section 4574, we need not analyze whether it is a deadly weapon or explosive.

II, III[2]

IV

The judgment is affirmed.

Hanson (P. D.), J., and Woolpert, J., concurred.

---

[2]See footnote 1, *ante.*