[No. A075434. First Dist., Div. Four. Aug. 18, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL J. PRUETT, Defendant and Appellant.

**COUNSEL**

Donald Secter, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, George F. Hindall III, and Donna B. Chew, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ANDERSON, P. J.**—Michael J. Pruett (appellant) was convicted by a jury of drawing or exhibiting a deadly weapon with the intent to resist or prevent arrest or detention by a peace officer in violation of Penal Code[1] section 417.8.[2] We consider and reject his contention that the trial court was required, sua sponte, to define the term "deadly weapon," as used in section 417.8. We also consider and reject appellant's claim that brandishing a weapon under section 417, subdivision (a)(1), is a lesser included offense under section 417.8. We also reject two other claims of instructional error and affirm.

## I. FACTS

On August 8, 1995, Dawn Weathers, acting manager for Lyon's restaurant in Santa Rosa, received a series of complaints from customers about a man sitting outside the restaurant. Weathers went outside and saw appellant sitting under a tree in the parking lot; she asked him to leave. Appellant, who was playing with a knife at the time, said that he did not have to leave. Weathers threatened to call the police; appellant stated that she should go ahead and do so. Weathers then acted on her threat. While the police were on the way, appellant moved from the parking lot and sat on a bench near the front door of the restaurant. A young man, Robert Berti, was sitting on the bench, when appellant sat down.

Shortly thereafter, Santa Rosa Police Officer Francis Keith Thomas, dressed in uniform, arrived at Lyon's. Officer Thomas went inside and spoke to Weathers, who informed him that appellant had moved to the bench outside the door and that she had seen him put the knife in the right rear pocket of his pants. Officer Thomas had observed appellant when he arrived at the restaurant and thought appellant appeared under the influence. Officer Thomas went outside and addressed appellant, telling him that he was aware that appellant had a weapon and asking him to stand up, keep his arms away from his body and turn away from him.

Appellant complied with Officer Thomas's requests; however, after turning away from Officer Thomas, appellant began to reach his hand back toward his right rear pocket where Officer Thomas had observed a bulge. Officer Thomas told appellant not to bring his hands down. Nonetheless,

---

[1]All further statutory references are to the Penal Code.

[2]Section 417.8 provides: "Every person who draws or exhibits any firearm, whether loaded or unloaded, or other deadly weapon, with the intent to resist or prevent the arrest or detention of himself or another by a peace officer shall be imprisoned in the state prison for two, three, or four years."

appellant reached in his pocket and started to pull something out. At that point, Officer Thomas pushed appellant "slightly" and backed up. As appellant turned around, Officer Thomas could see that he was holding a folding knife in his right hand. Appellant was trying to open the blade. Officer Thomas then gave appellant a two-second burst of pepper spray. Appellant put his left hand up to wipe away the effects of the spray, then grabbed the knife and opened the blade.

Officer Thomas told appellant to drop the knife; however, appellant continued to wipe his eyes and began to walk toward Officer Thomas, "slashing back and forth with the knife." Appellant continued forward for a distance of approximately 20 feet, continuously slashing with the knife. However, eventually, appellant said, " 'Fuck this,' " threw the knife aside and fell to his knees. Officer Thomas then subdued appellant without further incident.

The prosecution called four percipient witnesses to the incident, apart from Officer Thomas. Weathers corroborated the fact that appellant was waving the knife around. She also testified that appellant had the knife out when Officer Thomas first used the spray. Joe Harold Henderson, a Lyon's patron, testified that Officer Thomas used the pepper spray to defend himself and that he observed appellant hold the knife in front of him and move it back and forth in a "[f]airly wide" swath. Jeffrey Earl Hammond, another patron, also corroborated Officer Thomas's version of the incident, confirming that appellant had the knife out at the time Officer Thomas used the spray and that appellant threatened Officer Thomas with the knife by waving it back and forth. The only witness who offered a different perspective was Berti, who indicated that appellant did not pull out the knife until Officer Thomas had sprayed him. Berti also testified that he did not see appellant slash at the officer, but he admitted that his view was cut off by appellant's body.

## II. THE TRIAL COURT PROPERLY INSTRUCTED THE JURY IN ALL RESPECTS

### A. *The Trial Court Was Not Required to Define "Deadly Weapon," as Used in Section 417.8*

A trial court has a duty to instruct, sua sponte, when a term used in the instructions has "a technical meaning peculiar to the law. . . ." (*People v. Reynolds* (1988) 205 Cal.App.3d 776, 779 [252 Cal.Rptr. 637].) Appellant contends that "deadly weapon" has such a technical meaning and that the court's failure to define that term requires reversal.

Appellant is correct that the term "deadly weapon" has taken on a technical meaning in certain contexts. The question for us to resolve is whether or not this is such a context.

"Occasionally, the term 'deadly weapon' has been specially defined by statute to include [certain] dangerous weapons. Thus, for example, former section 3024, subdivision (f) defined a deadly weapon to include 'any . . . pistol, revolver, or any other firearm, . . . and any metal pipe or bar used or intended to be used as a club.' [Citation.] This definition, it has been held, 'includes any firearm, whether loaded or not, . . .' [Citation.] But such a special definition . . . 'is restricted in terms to said section 3024 and has no bearing upon the meaning of the same words when used in other provisions of the Penal Code.' [Citations.]" (*People* v. *Brookins* (1989) 215 Cal.App.3d 1297, 1307 [264 Cal.Rptr. 240].) The definition of "deadly weapon" as used in other parts of the Penal Code has evolved largely through case law.

In *People* v. *Raleigh* (1932) 128 Cal.App. 105 [16 P.2d 752] (*Raleigh*), the Court of Appeal considered Raleigh's conviction of attempted first degree robbery[3] based on evidence that he entered a haberdashery, approached the proprietor, pointed a gun at him and said, "Stick them up." When the proprietor ran, Raleigh fled without cash or hat in hand. (*Id.* at p. 107.) Raleigh claimed that the absence of evidence that the gun was loaded precluded his conviction for attempted first degree robbery. In affirming the conviction, the court noted that all but one of seven earlier Court of Appeal decisions it had reviewed had concluded that a perpetrator armed with an unloaded gun was deemed " 'armed with a dangerous or deadly weapon' within the meaning of [section 211a]." (*Raleigh, supra,* at pp. 107-108.) The *Raleigh* court noted that it did not agree with the single case which ran against the majority trend. (*Id.* at p. 108.)

The court then offered its view of the distinctions which should be made between classes of dangerous or deadly weapons: "From a reading of the decisions on the subject we are of the opinion that a distinction should be made between two classes of 'dangerous or deadly weapons'. There are, first, those instrumentalities which are weapons in the strict sense of the word, and, second, those instrumentalities which are not weapons in the strict sense of the word, but which may be used as such. The instrumentalities falling in the first class, such as guns, dirks and blackjacks, which are weapons in the strict sense of the word and are 'dangerous or deadly' to others in the ordinary use for which they are designed, may be said as a matter of law to be 'dangerous or deadly weapons'. This is true as the

---

[3]When *Raleigh* was decided, section 211a defined first degree robbery as robbery "perpetrated by torture or by a person being armed with a dangerous or deadly weapon. . . ."

ordinary use for which they are designed establishes their character as such. The instrumentalities falling in the second class, such as ordinary razors, pocket-knives, hatpins, canes, hammers, hatchets and other sharp or heavy objects, which are not weapons in the strict sense of the word and are not 'dangerous or deadly' to others in the ordinary use for which they are designed, may not be said as a matter of law to be 'dangerous or deadly weapons'. When it appears, however, that an instrumentality other than one falling within the first class is capable of being used in a 'dangerous or deadly' manner, and it may be fairly inferred from the evidence that its possessor intended on a particular occasion to use it as a weapon should the circumstances require, we believe that its character as a 'dangerous or deadly weapon' may be thus established, at least for the purposes of that occasion.'" (*Raleigh, supra,* 128 Cal.App. at pp. 108-109.)

The Supreme Court has followed *Raleigh* on two significant occasions. In *People* v. *Graham* (1969) 71 Cal.2d 303 [78 Cal.Rptr. 217, 455 P.2d 153] (*Graham*), two defendants, Graham and Ernest Shepard, were convicted of first degree murder and first degree robbery. The latter offense required, as it did when *Raleigh* was decided, that the robbery must be perpetrated by torture or by a person armed with a dangerous or deadly weapon. The evidence indicated that Shepard kicked the victim while wearing shoes. The *Graham* court concluded that a "shod foot may be used in such a manner and with such intent as to constitute a dangerous or deadly weapon . . . ." (*Id.* at p. 327.) The court then analyzed whether or not the jury had been adequately instructed about the circumstances under which a shod foot can become a deadly or dangerous weapon.

The court first noted that "[a]lthough the manner of the use of an object does not automatically determine whether a defendant was 'armed with a dangerous or deadly weapon,' the method of use may be evidence of the intent of its possessor. . . ." (*Graham, supra,* 71 Cal.2d at p. 327.) The court then quoted the portion of *Raleigh* set forth above before returning to Shepard's conviction: "In the present case, the jury could conclude that Ernest Shepard's shoe was a 'dangerous or deadly weapon' only if the jury could find that the shoe could be used in a dangerous or deadly manner and that the defendant intended so to use it. The manner in which Shepard did use the shoe in the present case serves as evidence that it could be used as a dangerous or deadly weapon and that he intended to use it as such against the decedent. If the jury had been instructed in accordance with *Raleigh,* no question would arise as to the sufficiency of the evidence on this issue. [¶] As *Raleigh* points out, however, a critical jury issue does arise in a case such as the present in which the defendant employs an instrumentality which in the strict sense of the word does not constitute a dangerous or deadly

weapon. The issue then turns on whether the instrumentality was one which, under the control of the perpetrator of the robbery, could be used in a dangerous or deadly manner and whether the perpetrator intended to use it as a weapon. In the absence of an instruction explaining the requisites for a finding that the defendant was 'armed with a dangerous or deadly weapon,' the jury could not rationally apply *the language of Penal Code section 211a to the facts of this case.* [¶] The general rule which provides that in defining the elements of a crime it is enough for the court to instruct in the language of the statute when the defendant fails to request an amplification thereof [citation] will not prevail when the jury would have difficulty in understanding and applying the statute. Under such circumstances, a court must give additional guidance and clarification on its own motion. [Citations.] *In a robbery case,* such as [this] one, [when] the instrumentality used is *neither* a weapon in the strict sense of the word nor 'dangerous or deadly' to others in the ordinary use for which it is designed, the trial court should specify the issue which the jury must resolve in the form suggested by *Raleigh.*" (*Graham, supra,* at pp. 328-329, fn. omitted, italics added.)

In *People* v. *McCoy* (1944) 25 Cal.2d 177 [153 P.2d 315] (*McCoy*), the defendant was convicted of assault with a deadly weapon based on evidence that McCoy assaulted his victim, knocking her to the pavement, holding a knife to her throat and threatening to use it on her if she cried out. (*Id.* at p. 188.) McCoy contended that the trial court erred in failing to instruct on the lesser included offense of simple assault. The Supreme Court rejected that claim, holding that the evidence introduced could only sustain a finding that McCoy was guilty of "an offense more serious than simple assault, or he was not guilty . . . ." (*Id.* at pp. 193-194.) In reaching that conclusion, the court noted that in "assault with a deadly weapon, the character of the particular agency employed is the substance of the offense. While a knife is not an inherently dangerous or deadly instrument as a matter of law, it may assume such characteristics, depending upon the manner in which it was used, and there arises a mixed question of law and fact which the jury must determine under proper instructions from the trial court. [Citations.]" (*Id.* at p. 188.) The court then went on to quote most of the portion of *Raleigh* set forth above and ultimately concluded that the instructions given on intent were proper ones. (*Id.* at pp. 188-189.)

Recently, Division Three of this district considered whether or not a screwdriver could constitute a "deadly weapon" under section 417.8, when that instrument was waved aggressively to prevent arrest by a number of East Palo Alto police officers. (*People* v. *Simons* (1996) 42 Cal.App.4th 1100 [50 Cal.Rptr.2d 351] (*Simons*).) The *Simons* court first made the *Raleigh/Graham* distinction between inherently dangerous or deadly weapons and those which are dangerous or deadly weapons, as a consequence of

their intended use. (*Id.* at pp. 1106-1107.) The *Simons* court rejected the defendant's claim that section 417.8 could be violated only by the use of inherently dangerous weapons. (*Simms, supra,* at pp. 1107-1108.) However, Simons did not claim that the instructions given were deficient, due to a lack of definition of "deadly weapon," as used in section 417.8. (*Simms, supra,* at pp. 1106-1108.) Thus, the necessity of giving such definition in a section 417.8 context remains an open question.

Appellant claims, based on *Raleigh, Graham* and *McCoy,* that the "pocket knife" he employed is not a "deadly weapon" as a matter of law. He argues that the court erred by failing to instruct the jurors that the knife he exhibited constituted a deadly weapon for section 417.8 purposes if (and only if) they found that the knife was capable of killing or seriously injuring another and that he intended to use the knife as a weapon during the confrontation with Officer Thomas.

■ Appellant is correct that the *Raleigh* definition of "deadly weapon," as adopted by the Supreme Court for assault with a deadly weapon in *McCoy* and reinforced for robbery committed with a deadly weapon in *Graham,* has two components to it: (1) the instrument must be "capable" of being used in a deadly fashion, and (2) the possessor must "intend" that it serve such a purpose when the crime is committed. However, closer examination of that two-part test reveals that it represents little more than a breakdown of "deadly weapon" into two concepts: (a) what constitutes a "deadly" instrument? and (b) when may such an instrument be deemed a "weapon"?

■ The word "deadly" *means* "likely to cause or *capable* of causing death." (Webster's Ninth New Collegiate Dict. (1984) p. 327, italics added.) Thus, "deadly" in common parlance is the same as "deadly" under the *Raleigh* test. As such, "deadly," as employed in the term "deadly weapon," is not a technical term, requiring instruction as to its meaning. (*People* v. *Rowland* (1992) 4 Cal.4th 238, 270-271 [14 Cal.Rptr.2d 377, 841 P.2d 897].)

Under some circumstances, the question of whether or not an object used by a defendant is capable of causing death may well be tied to the manner in which it is used. In *Simons,* for example, the defendant kept police officers at bay by waving the screwdriver—an instrument which would not ordinarily be thought of as "deadly." It was found to be "deadly" (and, at the same time, a "deadly weapon") by the manner in which it was displayed by the defendant. Thus, when the instrument employed is an "innocent-appearing utensil," an instruction which establishes its nature ("deadly" or not) by reference to its use may be required. (See Use Note to CALJIC No. 12.42.)

When, on the other hand, the instrument is a knife with an open blade, a special instruction designed to assist the jury in determining whether or not

it is *capable* of causing death is unnecessary. Nearly all knives have sharp edges and points which are *designed* to cut things, and knives can be—and all too often are—employed to cut—and kill—people. Jurors can certainly employ common sense and experience to determine whether or not such a knife is a "deadly" instrument. Thus, the trial court did not err in failing to define "deadly." We next turn to the second part of the *Raleigh* test.

We first note that the second part of the test does not constitute a *definition* of "weapon." In common parlance, a weapon is "an instrument of offensive or defensive combat: something to fight with" or "a means of contending against another." (Webster's Ninth New Collegiate Dict., *supra*, p. 1335.) What *Raleigh, McCoy* and *Graham* indicate is that it is the *use* of a "deadly" instrument for the *purpose* of effecting (or the "intent" to effect) a robbery or an assault which turns a "deadly instrument" into a "deadly *weapon*."

The question then becomes whether or not the *Raleigh* "intent" test need be applied for section 417.8 purposes. We hold that it does not. To find otherwise would be tantamount to rephrasing section 417.8 to make it a crime for a defendant to draw or exhibit "a deadly instrument with the intent to use it as a weapon with the intent to prevent the arrest or detention of himself or another by a peace officer." The fact of the matter is that a jury's determination that a defendant employed a deadly instrument (in this case, a knife) with the intention of preventing his arrest or detention would necessarily include a finding that the deadly instrument was used as a weapon—or that the defendant intended to use it as a weapon—as the term "weapon" is used in common parlance.

In sum, the term "deadly weapon," as used in section 417.8, is not necessarily a technical one, requiring definition. Where, as here, the instrument employed is one which lay people could readily determine to be capable of causing death, no special definition of "deadly" is required. Because the use of such an instrument with the intent to resist arrest or detention necessarily encompasses its use or intended use as a weapon, no definition of "weapon" or "deadly weapon" is required.[4]

B. *Misdemeanor Brandishing Is Not a Lesser Included Offense of Drawing a Deadly Weapon for the Purpose of Resisting Arrest or Detention*

 " '[A]n offense is necessarily included in the charged offense if under the statutory definition of the charged offense it cannot be committed

---

[4]We note in passing that the question of whether or not appellant's knife—one described by witnesses as larger than a standard pocket knife with a locking mechanism—was a "deadly weapon" within section 417.8 was of such little controversy that the defense *conceded* the issue in closing argument. The defense theme consisted solely of a claim that the deadly weapon was drawn in self-defense.

without committing the lesser offense, or if the charging allegations of the accusatory pleading include language describing the offense in such a way that if committed as specified the lesser offense is necessarily committed. [Citation.]' [Citation.] The court has a sua sponte duty to instruct on [a] necessarily included offense[] when the evidence raises a question as to whether all [of] the elements of the charged offense have been proved and there is evidence of the lesser offense that would justify a conviction." (*Simons, supra,* 42 Cal.App.4th at p. 1108.)

Section 417, subdivision (a)(1), provides: "Every person who, except in self-defense, in the presence of any other person, draws or exhibits any deadly weapon whatsoever, other than a firearm, in a rude, angry or threatening manner, or who in any manner, unlawfully uses the same in any fight or quarrel is guilty of a misdemeanor . . . ." Appellant argues that section 417, subdivision (a)(1), is a lesser included offense of section 417.8.

■ Appellant acknowledges that violation of section 417, subdivision (a)(1), requires that a defendant draw or exhibit a deadly weapon in a "rude, angry or threatening manner" and that section 417.8 does not include such terminology. Nonetheless, he argues that the use of a deadly weapon to resist arrest "necessarily" includes "a finding that the weapon signaled a potential threat" and, thus, that the " 'rude, angry or threatening' element of section 417, subdivision (a)(1), is . . . subsumed within the deadly weapon requirement of section 417.8." We disagree.

First, as acknowledged by appellant and discussed in part II.A., *ante,* some objects constitute deadly weapons, as a matter of law. (*Raleigh, supra,* 128 Cal.App. at p. 108,) Where those objects are concerned, it is unnecessary to consider the manner in which they are used in order to find that they are "weapons" or "deadly weapons." Thus, where one of those weapons is drawn or exhibited in the presence of a peace officer, the intent to use it to resist arrest or detention may be established solely from the context in which it is drawn or exhibited (i.e., after a subject is told to raise his or her hands or that he or she is under arrest), regardless of the manner in which the weapon is drawn or exhibited.

Likewise, where the instrument is not a deadly weapon as a matter of law, the intent to use it for the purpose of resisting arrest or detention can be inferred from the context in which it is drawn (again, for example, when a subject is told to raise his or her hands or that he or she is under arrest). As reflected in part II.A., *ante,* drawing or exhibiting an instrument which is "capable" of killing another with the intent to resist arrest or detention is sufficient to establish both that the instrument in question was a deadly

"weapon" (or "deadly weapon") and that its use constituted a violation of section 417.8.

Thus, regardless of whether the instrument is a deadly weapon as a matter of law or a deadly instrument used to prevent arrest or detention, it is not necessary that the instrument be drawn or exhibited in a specific way—that is, in a "rude, angry or threatening manner"—to constitute a violation of section 417.8. Because drawing or exhibiting a deadly weapon in that fashion *is* required to constitute a violation of section 417, subdivision (a)(1), violation of that section is not necessarily subsumed within a violation of section 417.8. As such, the trial court was not required to instruct, sua sponte, on the former section.

## C. *Appellant's Remaining Claims of Instructional Error Are Without Merit*

 Appellant also asserts that the trial court committed reversible error in refusing to give CALJIC No. 4.35 (6th ed. 1996 bound vol.), relating to ignorance or mistake of fact.[5] He asserts that the instruction sets forth "a theory of the case that was supported by the evidence: appellant was so intoxicated, he did not know Thomas was a police officer. . . . When Thomas pepper-sprayed him without warning, . . . he believed he was under attack and reacted accordingly. Under this theory, his drawing of the pocket knife could be seen as a good faith response to the perceived attack and not resistance to a detention. . . ." We disagree.

We first note that the argument appellant advanced below about the need for CALJIC No. 4.35 is different from the argument he advances on appeal. When the trial court asked the prosecutor if he had any objections to the instructions proposed by the defense, the prosecutor replied that he objected to CALJIC No. 4.35 on the basis that "there is no evidence of that in this case, not any evidence that it has been proffered by the defense." The defense replied: "My argument simply is there—that there be an inference from the evidence that has been presented. It was mistake as to whether he was being assaulted or simply being detained. Otherwise I will submit it." The defense did not assert that the mistake stemmed from appellant's intoxication, and the court rejected appellant's request that CALJIC No. 4.35 be given on the grounds asserted by the prosecution—that no evidence supported appellant's having made a mistake of fact. The prosecutor was correct: No evidence supported a theory that appellant was mistaken about

---

[5]CALJIC No. 4.35 provides: "An act committed or an omission made in ignorance or by reason of a mistake of fact which disproves any criminal intent is not a crime. [¶] Thus a person is not guilty of a crime if [he] [she] commits an act or omits to act under an actual [and reasonable] belief in the existence of certain facts and circumstances which, if true, would make such an act or omission lawful."

Officer Thomas's being a police officer. Moreover, no evidence supported the concept that Officer Thomas initiated an assault on appellant; all evidence supported the conclusion that Officer Thomas approached appellant and initiated investigative procedures before using the pepper spray. Thus, the court did not err in failing to give CALJIC No. 4.35 on the theory advanced below.

We further note that other instructions given by the court adequately covered the theory on which appellant now asserts that CALJIC No. 4.35 should have been given. Over prosecution objection, the court gave CALJIC No. 4.21.1 which informed the jury that appellant's intoxication could serve to negate the specific intent required for violation of section 417.8. The jurors' conclusion that appellant violated that section means that they found that appellant's level of intoxication was insufficient to negate his ability to form the specific intent to violate section 417.8; that conclusion negates any possibility that the jurors would have concluded that appellant was so intoxicated that he could not perceive that Officer Thomas was a peace officer conducting an investigation. Thus, any error—and we find no error—in failing to give CALJIC No. 4.35 is harmless beyond a reasonable doubt.

■ Appellant finally argues that the trial court committed reversible error in failing to give CALJIC No. 5.50 on the right of a person threatened with attack to defend himself or herself, rather than retreat.[6] Appellant acknowledges that the jurors were instructed on the right of self-defense generally[7] but asserts that the jurors should have been informed that in the exercise of the right of self-defense a person under assault or threat of attack need not retreat. We find no error in the trial court's decision. No evidence was introduced that appellant considered retreating but chose not to do so or that appellant could have retreated but did not do so. Thus, an instruction on the right *not* to retreat was not required under the evidence presented.

---

[6]CALJIC No. 5.50 (6th ed. 1996 bound vol.) provides: "A person threatened with an attack that justifies the right of self-defense need not retreat. In the exercise of [his] [her] right of self-defense a person may stand [his] [her] ground and defend [himself] [herself] by the use of all force and means which would appear to be necessary to a reasonable person in a similar situation and with similar knowledge; and a person may pursue [his] [her] assailant until [he] [she] has secured [himself] [herself] from danger if that course likewise appears reasonably necessary. This law applies even though the assailed person might more easily have gained safety by flight or by withdrawing from the scene."

[7]The court gave CALJIC No. 5.30 (6th ed. 1996 bound vol.): "It is lawful for a person who is being assaulted to defend [himself] from attack if, as a reasonable person, [he] has grounds for believing and does believe that bodily injury is about to be inflicted upon [him]. In doing so, that person may use all force and means which [he] believes to be reasonably necessary and which would appear to a reasonable person, in the same or similar circumstances, to be necessary to prevent the injury which appears to be imminent."

## III. CONCLUSION

The judgment is affirmed.

Reardon, J., and Hanlon, J., concurred.

A petition for a rehearing was denied September 12, 1997, and appellant's petition for review by the Supreme Court was denied December 10, 1997.