[No. A081294. First Dist., Div. Two. Oct. 19, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
EDWARD L. MARTINEZ, Defendant and Appellant.

**COUNSEL**

Susan Kathleen Kahn, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, and Jeffrey M. Laurence, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**KLINE, P. J.**—Edward L. Martinez appeals his conviction for possession of a deadly weapon in county jail, in violation of Penal Code section 4574,

subdivision (a).[1] On appeal, he contends the items found in his cell did not amount to deadly weapons, and that the trial court committed reversible error in defining "deadly weapon" as an item that has the "reasonable potential," rather than the "reasonable likelihood," of being used "in a manner that would cause great bodily injury or death." We shall affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

On July 24, 1997, appellant was charged with possession of a deadly weapon while lawfully confined in county jail, a violation of section 4574, subdivision (a). The complaint also alleged the following enhancements: (1) two prior strike convictions, enhancements under section 1170.12; and (2) four prior prison convictions, enhancements under section 667.5, subdivision (b).

At trial, the following evidence was presented: On May 15, 1997, Sonoma County Correctional Officer Jeffrey Dicello entered appellant's jail cell and found a "Swiss Army knife-type knife," a nail clipper with attachments, and a Bic cigarette lighter rolled up inside a T-shirt on appellant's desk. The Swiss Army knife consisted of a handle containing a knife blade, a nail file and a little pair of scissors. The nail clippers had a two-inch, knife-type attachment and a hooked can opener folded within the handle. The Bic lighter was functional and could ignite.

Officer Dicello testified that the knife and can opener on the nail file could be used as weapons. Correctional Sergeant Charles Cook testified that the knife blades on the Swiss Army knife and nail clipper could be used as stabbing weapons, and that the can opener attachment on the nail clipper could be used to slash someone across the face or throat. Sergeant Cook further stated that these items were readily concealable and, if ultimately used as weapons, untraceable. Deputy Sheriff Spencer Martin, who prepared the crime report for the incident, testified on direct examination that Sergeant Cook described only the Swiss Army knife as a deadly weapon when he turned the items over to him. On rebuttal, Deputy Martin was qualified as an expert in identifying deadly weapons. He subsequently testified that the nail clipper and attachments was "definitely" a deadly weapon.

Sergeant Cook explained that an inmate could use a Bic cigarette lighter to forge a weapon by melting and shaping an otherwise harmless plastic item

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

into a stabbing weapon. He concluded that inmates are not allowed to possess any of the items found in appellant's cell because "they all pose a threat to staff or other inmates." Sergeant Cook also acknowledged that each of the items had legitimate, harmless uses, and that inmates were allowed to possess items such as toothbrushes, pens, and full-length, sharpened pencils. Officer Dicello testified that inmates may temporarily sign out nail clippers (minus the attachments) and scissors for personal use, and that inmates are not monitored while they use these items.

On December 4, 1997, a jury found appellant guilty of the charged offense. Appellant waived his right to a jury trial on his prior strike and prison term allegations, and on December 5, the court found each of the allegations to be true. The court then struck one of appellant's prior strike conviction allegations, pursuant to section 1385, and imposed a sentence of twelve years: four years for the new offense, doubled pursuant to section 1170.12, subdivision (c)(1), plus four 1-year prior prison term enhancements, running consecutively. Appellant filed timely notice of appeal on January 6, 1998.

## DISCUSSION

■ At trial, defense counsel argued for an instruction requiring the jury to find that the items posed at least a "reasonable possibility" of inflicting injury before it could convict appellant for possessing them. He asserted that the prosecutor's "reasonable potential" standard invited arbitrary and absurd findings as to what constituted a deadly weapon under the statute. The prosecutor argued that a "reasonable possibility" standard was improper because it necessarily put the inmate's intent at issue. Since intent to use the objects as weapons was not an element of section 4574, the prosecutor asserted he didn't have to "show intent or the use that these items are going to be put to, only that they have the potential for that use." The trial court admitted it had trouble finding a significant difference between the meanings of the words "possibility" and "potential," but acknowledged that section 4574 has no intent requirement. In the end the trial court followed the "reasonable potential" standard, based on language in *People* v. *Savedra* (1993) 15 Cal.App.4th 738 [19 Cal.Rptr.2d 115].

In its instructions to the jury, the trial court set forth the elements of a section 4574, subdivision (a), violation as follows: "One, a person possessed a weapon. Two, the weapon was a deadly weapon. Three, this was

without authorization. And, four, this was while lawfully committed to the county jail."[2] The court then defined "deadly weapon" as "any weapon, instrument or object that has the reasonable potential of being used in a manner that would cause great bodily injury or death." Appellant's sole contention on appeal is that "reasonable potential" sweeps too broadly and that the term "reasonable likelihood" should have been used instead. We disagree.

*People* v. *Savedra, supra,* 15 Cal.App.4th 738, addressed the precise question at issue in this case. In *Savedra,* prison guards caught the defendant trying to conceal an unsharpened nail with a toilet paper handle in his pocket. (*Id.* at p. 741.) At trial, the court instructed the jury that " '[a] deadly weapon means any weapon, instrument or object that is likely to inflict great bodily injury or death.' " (*Id.* at p. 744.) The jury subsequently sent a note to the trial court, asking if the word "likely" in the instruction meant that " 'it must be 1) merely possible? [or] 2) more probable than not?' " (*Id.* at p. 744.) The court responded that "likely" " 'means: has the potential for use as a deadly weapon.' " (*Ibid.*) The Court of Appeal upheld the instruction, reasoning: " 'Section 4574 proscribes possession, not use, as noted above. Therefore, the statute is concerned with the *potential* of the item in question. . . . Effective protection of inmates and officers from armed attack depends upon the prohibition of possession of *all* deadly weapons in jail. This valid legislative objective does not except weapons with dangerous *capabilities* which also have innocent uses . . . .' " (*Id.* at pp. 744-745, italics in original, quoting *People* v. *Rodriquez* (1975) 50 Cal.App.3d 389, 396 [123 Cal.Rptr. 185].) Thus, "[m]erely because slashing someone with a toothbrush-razor might 'inflict great bodily injury or death' only 49 percent or 32 percent of the time does *not* mean such an item is outside the definition of 'deadly weapon.' *Because* it might inflict such injury or death 49 percent or 32 percent of the time it has a 'potential,' a 'capability,' for causing 'great bodily injury or death' and thus is a 'deadly weapon.' " (15 Cal.App.4th at p. 745, italics in original.) The court expressly acknowledged that in ordinary usage the word "likely" means "probable" or "more probable than not," but

[2]Section 4574, subdivision (a) provides, in relevant part: "Except when otherwise authorized by law, or when authorized by the person in charge of the prison . . . or by an officer of the institution empowered by the person in charge of the institution to give such authorization, any person, who knowingly brings or sends into . . . any state prison or prison road camp or prison forestry camp, or other prison camp or prison farm or any other place where prisoners of the state prison are located under the custody of prison officials, officers or employees, or any jail or any county road camp in this state, or within the grounds belonging or adjacent to any such institution, any firearms, deadly weapons, or explosives, and any person who, while lawfully confined in a jail or county road camp possesses therein any firearm, deadly weapon, explosive, tear gas or tear gas weapon, is guilty of a felony and punishable by imprisonment in the state prison for two, three, or four years."

nonetheless deemed the alternative, legal meaning to be justified when defining "deadly weapon." (*Id.* at p. 744.)

Appellant does not contest the result in *Savedra*, but nonetheless argues that its use of the "potential" standard was improper. Mr. Savedra was caught in possession of what was "undisputably a jail-made weapon, with no imaginable nonagressive uses." Though the Court of Appeal's approval of the "potential" standard in that case "probably did not lead to a miscarriage of justice," appellant contends that standard is improper for general use because it does not allow a jury to determine that an object is *not* a weapon, notwithstanding the fact that it has peaceful uses, it has not been altered, and it is not brandished among fellow inmates. Thus, appellant asserts the trial court compelled the jury to convict solely because appellant was in prison, and because the items had some conceivable use as weapons, no matter how farfetched.

The application of section 4574, subdivision (a), is necessarily broad because of manifest security concerns in prisons. Therefore, possession of a potentially dangerous item is a crime of relatively strict liability: "Evidence of harmless use by jail inmates, including defendant, may be relevant if it bears on the likelihood that an item will cause death or serious bodily injury. Such evidence is defensive, however. It is not necessary for the People to prove the item has no harmless use. Such a construction of section 4574 would effectively nullify its purpose." (*People* v. *Rodriquez, supra,* 50 Cal.App.3d 389, 396.) Appellant's contention that arguably *any* item can be deemed a deadly weapon under the "potential" standard is misplaced. The jury in this case was instructed to determine whether the appellant's items had "the *reasonable* potential of being used in a manner that would cause great bodily injury or death." (Italics added.) In light of prison safety concerns, this constraint is sufficient to ensure that juries do not erroneously evaluate the potential danger of commonplace, harmless items.

Appellant also seeks to distinguish *Savedra* and various other cases on the grounds that each involved either a jail-modified object, or a "neutral" object observed in use as a weapon. (See, e.g., *People* v. *Velasquez* (1984) 158 Cal.App.3d 418 [204 Cal.Rptr. 640] [a sharpened piece of metal from a bunk railing with a cloth handle]; *People* v. *Talkington* (1983) 140 Cal.App.3d 557 [189 Cal.Rptr. 735] [a crude firearm made of a tightly rolled tube of paper with one end sealed with melted plastic, a hole in the tube near the closed end, and containing 30 match heads]; *People* v. *Hisquierdo* (1975) 45 Cal.App.3d 397 [119 Cal.Rptr. 378] [pushrod from a toilet or sink observed

in use as a stabbing weapon].) Appellant contends the rulings in those cases were warranted because "the plowshares had already been beaten into swords." In this case there was no modification or aggressive use of the items. Therefore, appellant argues the trial court erred in not considering other "surrounding circumstances" of their possession.

Appellant relies on a number of cases to support this proposition, culminating with *People* v. *Pruett* (1997) 57 Cal.App.4th 77 [66 Cal.Rptr.2d 750]. In *Pruett*, the defendant was convicted of brandishing a deadly weapon with the intent to resist or prevent arrest by a peace officer, a violation of section 417.8.[3] The Court of Appeal, after considering several previous cases, posed two questions to define "deadly weapon" as set forth in the statute: "(a) what constitutes a 'deadly' instrument? and (b) when may such an instrument be deemed a 'weapon'?" (57 Cal.App.4th at p. 85.) The court defined " 'deadly' " as " 'likely to cause or *capable* of causing death.' " (*Ibid.*, quoting Webster's New Collegiate Dict. (9th ed. 1984) p. 327, italics added.) However, deadly capability alone did not make an item a "weapon." The court stated: "[I]t is the *use* of a 'deadly' instrument for the *purpose* of effecting (or the 'intent' to effect) a robbery or an assault which turns a 'deadly instrument' into a 'deadly *weapon*.' " (57 Cal.App.4th at p. 86, italics in original.) Thus, the defendant's pocketknife became a "weapon" when he brandished it at the police officer, even though it had peaceful uses in other situations. The court concluded that a specific instruction defining "deadly weapon" as an instrument intended to be used as a deadly weapon was not necessary, because the jury had already been instructed that section 417.8 required the defendant to intend to use the instrument to resist arrest: "Because the use of such an instrument with the intent to resist arrest or detention necessarily encompasses its use or intended use as a weapon, no definition of 'weapon' or 'deadly weapon' is required." (57 Cal.App.4th at p. 86, fn. omitted.)

Appellant argues that *Pruett* should govern the present case, and that the jury should have considered the circumstances under which appellant possessed his items before convicting him. However, *Pruett* and other similar cases were based on occurrences outside the prison setting; the overriding concern for prison security and safety was not considered by those courts. The pocketknife in *Pruett*, though ultimately employed for attack, could have been used for peaceful purposes in a street setting. Section 417.8

---

[3]Section 417.8 provides, in relevant part: "Every person who draws or exhibits any firearm, whether loaded or unloaded, or other deadly weapon, with the intent to resist or prevent the arrest or detention of himself or another by a peace officer shall be imprisoned in the state prison for two, three, or four years."

therefore required the court to consider Pruett's intended use for the weapon, and to use the circumstances of his actions to deduce that intent. In the present case, appellant was a prisoner at the time of the offense. Section 4574, subdivision (a), therefore governs the crime. Through that statute, the Legislature has made it clear that, in the interests of prison security, prisoners are forbidden to possess items that can be used as weapons even if those items can also be used for peaceful purposes. The *Savedra* court stated, and appellant concedes, that intent to use the items as weapons is not a necessary element of section 4574, subdivision (a). The unauthorized possession of a potentially dangerous instrument, alone, is sufficient to create the security risk sought to be controlled by that statute.

Appellant contends that failing to consider the "surrounding circumstances" in section 4574, subdivision (a), cases leads to absurd results. He argues: "If the fact that an object *could* be transformed into a jail weapon means that it *is* a jail weapon, then the toothbrush which appellant Martinez was concededly allowed to possess . . . was already the deadly weapon described in *Rodriguez* [*sic*]. His T-shirt was clearly adaptable as a gag or a garrotte. The comb and the pencils allowed under jail rules were at least as lethal as his nail clipper. The matches he would have been allowed to possess in the old jail could not have been less dangerous than the Bic lighter he brought into the new jail." (Italics in original.) Appellant's concern is misplaced.

First, as noted earlier, the jury in this case was instructed to convict only if the items at issue had a "reasonable potential" of inflicting great bodily injury or death. The word "reasonable" precludes a finding that an unmodified toothbrush, or a T-shirt, or a comb is a "deadly weapon" as set forth in the statute. Second, appellant was caught with a Swiss Army knife, nail clippers with an attached blade, and a functional Bic lighter. No stretch of the imagination is needed to conclude that a knife is a potentially lethal weapon. The court in *Pruett* noted: "Nearly all knives have sharp edges and points which are *designed* to cut things, and knives can be—and all too often are—employed to cut—and kill—people. Jurors can certainly employ common sense and experience to determine whether or not such a knife is a 'deadly' instrument." (*People* v. *Pruett, supra,* 57 Cal.App.4th at p. 86.) Further, all of the officers who testified in this case described appellant's items as "deadly weapons." Sergeant Cook testified that inmates were not allowed to possess any of the items because "they all pose a threat to staff or other inmates." The jury's finding that appellant's items were "deadly weapons," as set forth in section 4574, subdivision (a), was therefore far from "absurd" in this case.

## DISPOSITION

The judgment is affirmed.

Haerle, J., and Ruvolo, J., concurred.