Filed 7/31/24  P. v. Newton CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BRIAN JOSEPH NEWTON,<br><br>    Defendant and Appellant. | D081756<br><br><br>(Super. Ct. No. INF1700664) |

APPEAL from a judgment of the Superior Court of Riverside County, Steven G. Counelis, Judge.  Affirmed in part, reversed in part, and remanded for resentencing.

Michael Allen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Junichi P. Semitsu and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

Brian Joseph Newton appeals the judgment sentencing him to prison after a jury found him guilty of resisting an executive officer by force or

violence and found true an allegation he was armed with a deadly weapon. The trial court found he had two prior convictions that constituted strikes under the Three Strikes law and imposed a sentence of 25 years to life in prison. Newton claims: (1) the third strike prison term must be reversed because the evidence was insufficient to prove the deadly weapon allegation that subjected him to that term; and (2) presentence credits were not correctly calculated. We agree with both arguments and remand the matter for resentencing and recalculation of credits.

## I.

## FACTUAL BACKGROUND

A.  *People's Case*

Denise Patterson was walking her chihuahua on a leash one evening in a public place when she encountered Newton. As she passed by, he said "he was going to cut [her] and [her] dog." Patterson asked, "[W]hat's your problem, buddy?" Newton responded, "I'll kill you and your dog." Patterson noticed Newton was holding a knife near his hips with the blade protruding between his fingers. She "got scared," "backed up," and called 911. Newton walked away.

Casey Morrison, a deputy sheriff, responded to Patterson's 911 call soon thereafter. Morrison was directed to Newton, who was sitting on a bench. Morrison approached, stated he had received calls about Newton's behavior, and asked whether Newton had a knife. Newton said he had a knife in a back pocket. Morrison told Newton to stand up, turn around, and put his hands behind his back so that Morrison could put handcuffs on Newton while Morrison conducted an investigation. As Morrison attempted to put handcuffs on Newton, he pulled away and turned to face Morrison. A scuffle followed during which both men fell to the ground. After Morrison punched Newton in the face repeatedly and threatened to use a taser,

2

Newton stopped fighting and Morrison put him in handcuffs. Morrison never saw a knife during his interactions with Newton.

A knife with a blade between one and one-half inches long was found in Newton's back pocket during a search of his person after the scuffle with Morrison. A photograph of the knife was introduced at trial.

B.    *Newton's Case*

Newton's version of his encounter with Patterson differed from hers. He said she was walking four dogs on leashes, "two chihuahuas and two . . . dogs about 50-pound each." As Patterson approached Newton, the dogs "started growling and snapping and gnashing their teeth at [him]." The dogs pulled Patterson toward Newton and bit him "on the left shoe and right sock." He used a bottle opener to distract the dogs, which stopped growling and barking and sat down. Patterson let go of the leashes and walked away from the dogs. When she returned to take up the leashes, "the dogs began aggressively growling and barking again, snarling, gnashing their teeth, like they wanted to attack somebody." Newton twice told Patterson he "would protect [him]self against her dogs." When she asked what he would do, he said he "would step on her dog." Patterson responded that "she would kill [him]." Newton admitted his knife was "out" but not "opened," and he denied he ever said he would cut or kill Patterson or her dogs.

Newton's version of his encounter with Morrison differed from Morrison's. Newton said Morrison approached with his gun drawn, secured his weapon, and told Newton "to put [his] hands out in front of [him] and lean forward." As Newton complied, Morrison swung handcuffs at Newton's head and tried to pull out his taser. The two got "tangled" and Newton fell to the ground. He rolled over onto his stomach so that he could be handcuffed, but Morrison started punching him in the head and threatened to tase him.

3

After Newton said, "I'm done," Morrison left and another deputy sheriff took custody of Newton.

## II.

## PROCEDURAL BACKGROUND

The People charged Newton with making a criminal threat against Patterson (count one; Pen. Code, § 422)[1] and resisting by force or violence an executive officer (Morrison) in the performance of his duty (count two; § 69). The People alleged Newton personally used a deadly or dangerous weapon (a knife) in making the criminal threat (§ 12022, subd. (b)), and alleged he was armed with a deadly weapon (a knife) in both offenses (§§ 667, subd. (e)(2)(C)(iii), 1170.12, subd. (c)(2)(C)(iii)). The People also alleged Newton had two prior convictions that constituted serious felonies for purposes of five-year enhancements (§ 667, subd. (a)) and strikes for purposes of the Three Strikes law (§§ 667, subds. (b)–(i), 1170.12). Newton pleaded not guilty by reason of insanity.

While the case was pending, the court found Newton mentally incompetent and suspended proceedings. (See § 1370, subd. (a)(1)(B).) He was committed to a state hospital until his competence was restored. (See §§ 1370, subd. (a)(1)(B)(i), (C), 1372, subd. (a).)

After Newton regained mental competence, the case proceeded to a jury trial. At the close of evidence, the court granted the People's motion to dismiss the allegation that Newton personally used a deadly weapon in committing the criminal threat. The jury found Newton not guilty of making a criminal threat and found him guilty of resisting an executive officer. It found true the allegation that in resisting an executive officer he was armed

---

[1]     Further undesignated section references are to the Penal Code.

4

with a deadly weapon.  In a separate sanity phase, the jury found Newton was sane when he resisted an executive officer.

About five months after the jury returned its verdicts, the court again found Newton mentally incompetent and suspended proceedings.  He was again committed to a state hospital until his competence was restored.

After Newton regained mental competence for the second time, the court held a trial at which it found true the allegations concerning his prior convictions.  The court then proceeded to sentencing.  It denied Newton's motions to classify the conviction of resisting an executive officer as a misdemeanor rather than a felony (§ 17, subd. (b)) and to dismiss the allegations concerning his prior strike convictions (§ 1385, subd. (a); *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 504).  The court sentenced Newton to prison as a third strike offender for 25 years to life.  (§§ 667, subd. (e)(2)(A)(ii), (C)(iii), 1170.12, subd. (c)(2)(A)(ii), (C)(iii).)  As to credits, the court stated it had "been provided credit time served of 1,583 actual [days served], plus 1,582 [days pursuant to section] 4019," and it would "accept as true at this point 100, plus 4041 days [for] time at Patton State Hospital," for "total credit [of] 3,666 days."  The corresponding minute order awarded 1,583 days for actual custody, plus 1,582 days pursuant to section 4019, plus "[c]redit for time served of additional 441 days," for a total of 3,606 days.

At a later hearing to clarify the sentence, the court struck the two five-year enhancements for the prior serious felony convictions.  (§§ 667, subd. (a)(1), 1385, subd. (a).)  It confirmed the sentence of 25 years to life in prison.  The court awarded credit for 1604 days of actual custody, plus 1604 days pursuant to section 4019, plus "[c]redit for time served of additional 441 days," for a total of 3,649 days.  The abstract of judgment awarded credits of

1,604 days for actual custody, plus 1,604 days pursuant to section 4019, for a total of 3,208 days.

## III.

## DISCUSSION

A. *The Three Strikes Deadly Weapon Allegation Must Be Supported by Evidence That Newton Used His Knife as a Weapon During the Offense*

Newton challenges the imposition of the prison term of 25 years to life on his conviction of resisting an executive officer. He argues the evidence was insufficient to support the jury's finding he was armed with a deadly weapon when he committed that crime (a finding necessary to subject him to the third strike prison term imposed) because the knife was not used in a way likely to cause great bodily injury or death. He asks us to reverse the sentence and to remand the matter for resentencing.

Under the Three Strikes law, a defendant who has two or more prior convictions of serious or violent felonies and is convicted of a new felony that is neither serious nor violent generally is subject to sentencing as a second strike offender. (§§ 667, subd. (e)(2)(C), 1170.12, subd, (c)(2)(C).) Newton has two prior serious felony convictions, and his current conviction of resisting an executive officer is itself neither a violent felony (§ 667.5, subd. (c)) nor a serious felony (§ 1192.7, subd. (c)). Under the general rule, then, he would be subject to a second strike prison term. An exception in the Three Strikes law allows imposition of a third strike prison term on a defendant in Newton's situation if the defendant "was armed with a . . . deadly weapon" during the commission of the current offense. (§§ 667, subd. (e)(2)(C)(iii), 1170.12, subd. (c)(2)(C)(iii).) The jury found true the allegation that in resisting an executive officer Newton "was armed with a deadly and dangerous weapon, to wit, a knife." He is thus subject to a third strike prison term if sufficient evidence supports the jury's finding.

6

For the jury to find the arming allegation true, the People had to prove Newton knowingly carried or had available for use, either offensively or defensively, a deadly weapon at some point in the course of resisting an executive officer. (*People v. Bland* (1995) 10 Cal.4th 991, 997 (*Bland*); *People v. Valdez* (2017) 10 Cal.App.5th 1338, 1347, 1349 (*Valdez*); *People v. Wandick* (1991) 227 Cal.App.3d 918, 927–928.)[2] To decide whether the evidence introduced at trial is sufficient to support the jury's finding against Newton, we view the record in the light most favorable to the People and determine whether it contains substantial evidence—i.e., evidence that is reasonable, credible, and of solid value—from which a rational jury could make the finding beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 318–319; *People v. Johnson* (1980) 26 Cal.3d 557, 578; *People v. Frias* (2024) 98 Cal.App.5th 999, 1015–1016.) We presume in support of the finding every fact the jury reasonably could deduce from the evidence, and if the evidence reasonably justifies the jury's finding, we affirm, even if the evidence reasonably could support a contrary finding. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890; *Frias*, at p. 1016.) "Before the judgment of the trial court can be set aside for insufficiency of the evidence to support the verdict of the jury, it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it." (*People v. Redmond* (1969) 71 Cal.2d 745, 755 (*Redmond*).)

---

2 The jury was instructed with a modified version of CALCRIM No. 3130 as follows: "A person is armed with a deadly weapon when that person: [¶] 1. Carries a deadly weapon or has a deadly weapon available for use in either offense or defense in connection with the crimes charged; [¶] AND [¶] 2. Knows that he or she is carrying the deadly weapon or has it available." The instruction defined "deadly weapon" as "any object, instrument, or weapon that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury."

Substantial evidence supports the jury's finding Newton was armed while resisting an executive officer.[3]  A defendant is armed if the defendant has the specified weapon available for use, either offensively or defensively." (*Bland*, *supra*, 10 Cal.4th at p. 997; see *People v. Byers* (2020) 53 Cal.App.5th 1106, 1110 ["a defendant is armed with a weapon even if it is not on his person if he knows it is in a place readily accessible to him"].)  See also *Valdez, supra*, 10 Cal.App.5th at pp. 1349, 1352–1353 [weapon must be available at some point in course of crime but need not facilitate crime].) " '[I]t is the availability—the ready access—of the weapon' "—not its use— " 'that constitutes arming.' " (*Bland*, at p. 997.)  The jury reasonably could conclude that during commission of the crime Newton knew the knife was "available for use" (*Bland, supra*, 10 Cal.4th at p. 997) based on his admission to Morrison that he had a knife in his back pocket and the parties' stipulation that during a subsequent search a knife was found in Newton's back pocket.  The jury reasonably could conclude the knife could have been used "either offensively or defensively" (*ibid.*) based on Patterson's testimony that Newton threatened to cut or kill her and her dog while he held a knife in his hand and his testimony that he had the knife "out" during the encounter with her and twice warned her that he "would protect [him]self against her dogs."  Newton does not argue that he was not "armed" for purposes of §667(e)(2)(C)(iii).

Instead, Newton argues that there was insufficient evidence to establish that his small knife constituted a "deadly weapon."  Newton contends the evidence was insufficient because during his encounter with

_____

[3]  "The term ' "executive officer" ' [as used in section 69] includes peace officers 'such as police officers or deputy sheriffs.' " (*People v. Orloff* (2016) 2 Cal.App.5th 947, 952.)  Newton does not dispute that Morrison, a deputy sheriff, qualifies as an executive officer.

Morrison "the knife never left [his] back pocket, and consequently he did not use the knife in a manner likely to cause great bodily injury or death." Specifically, Newton contends that "only two facts were submitted to the jury to support the arming enhancement"—"(1) the keychain knife was 'inherently deadly,' and (2) [he] used the knife in a way that was capable of causing and likely to cause death or great bodily injury. Neither of those facts was proved to the jury beyond a reasonable doubt." "Because there was no substantial evidence to support the findings the jury made to support the arming enhancement," he says, "his third strike cannot stand." We agree.

California law divides the definition of "deadly weapon" into two categories. (See, e.g., *People v. Perez* (2018) 4 Cal.5th 1055, 1065 (*Perez*).) The first category includes weapons that are inherently deadly. Firearms fall within this category. A firearm is a deadly weapon, regardless of how it is used or what it is capable of. For example, even an unloaded firearm constitutes a deadly weapon. (*People v. Raleigh* (1932) 128 Cal.App. 105, 108).

It is the second definitional category that is relevant here, because the object at issue was Newton's knife, and most knives, including Newton's knife, are not considered to be inherently dangerous. (See *People v. Aledamat* (2019) 8 Cal.5th 1, 6 (*Aledamat*)) ["Because a knife can be, and usually is, used for innocent purposes, it is not among the few objects that are inherently deadly weapons."].) Our Supreme Court tells us that for an object that is *not* inherently dangerous to be characterized as a deadly weapon, the object *must have been used* during the commission of the offense in a manner not only capable of producing but also likely to produce death or great bodily injury.

9

For example, in *People v. Aguilar* (1997) 16 Cal.4th 1023 (*Aguilar*), the Court considered whether the term "deadly weapon" as used in section 245 (assault with a deadly weapon) could include bare hands and feet. In reaching their decision, the Court concluded that a deadly weapon must be an object extrinsic from the human body, and stated:

> "As used in section 245, subdivision (a)(1), a 'deadly weapon' is 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.' [Citation.] Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such. [Citation.] Other objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury. In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue."

(*Aguilar,* at pp. 1028-1029.)

Thus, as noted in *Aguilar*, "an object not inherently deadly or dangerous" may be considered a deadly weapon if it "is used as such." (*Aguilar, supra*, 16 Cal.4th at p. 1029.) In its discussion, the Court in *Aguilar* cited *In re Jose R.* (1982) 137 Cal.App.3d 269, 275–276; and *People v. Brookins* (1989) 215 Cal.App.3d 1297, 1305-1306 for the proposition that "a 'deadly' weapon is one *that is used* in such a manner as to be capable of producing death or great bodily injury." (*Aguilar,* at p. 1033; first italics added; second italics omitted.) The *Aguilar* Court further observed that "[t]here can be no doubt that some footwear, such as hobnailed or steel-toed boots, is capable of *being wielded in a way* likely to produce death or serious injury, and as such may constitute [deadly] weapons within the meaning of section 245, subdivision (a)(1)." (*Aguilar,* at p. 1035, italics added.)

10

More recently, in *Perez, supra,* 4 Cal.5th at p. 1065, in the context of a petition for resentencing under section 1170.126, the Court concluded that the petitioner was ineligible for relief because the evidence showed that he had been armed with a deadly weapon in the commission of the offense. (*Perez,* at p. 1067.)  Specifically, the Court concluded that a vehicle fell within the definition of a deadly weapon because the defendant had driven the vehicle with the victim's arm trapped in the window.  The Court defined "deadly weapon" as "any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury." (*Id.* at p. 1061.)  The Court noted that "[i]n determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue." (*Id.* at p. 1065.)

Thus, in defining "deadly weapon," whether for purposes of a statute or an enhancement, if the object is not inherently dangerous, the evidence must show that the defendant *used* the object as a weapon, i.e., in a manner that was capable of causing death or great bodily injury.  See also *Aledamat*, *supra*, 8 Cal.5th at p. 6 (for a knife to be a deadly weapon, it must have become "deadly" because of the manner in which it was used).  It is insufficient to show that the object "could have been used" or was "capable of being used" in a dangerous or deadly fashion.

In practical application, it makes sense that to qualify as a deadly weapon, an object not inherently deadly must have been used during the offense in a deadly fashion.  The reader of this opinion may have, in close proximity, a pencil; a pair of scissors; a heavy paperweight or bookend; or a screwdriver.  It would be unreasonable to conclude that because each of these proximate objects *could be* used as a deadly weapon, the reader is therefore

11

armed with a deadly weapon. It is the use of the weapon that transforms an innocent item into a deadly weapon.

Here, the trial court properly instructed the jury that "[a] deadly weapon is any object, instrument, or weapon that is inherently deadly or *one that is used in such a way* that it is capable of causing and likely to cause death or great bodily injury." (Fn. 2, *ante*, italics added). The People did not challenge this instruction before the trial court and although in this appeal they take some issue with the instruction, they do not argue the court erred in giving the instruction.

Respondent correctly distinguishes statutes that proscribe the *use* of a weapon with those that proscribe being *armed* with a weapon. But the Respondent then conflates the definition of "armed" with the definition of "deadly weapon." For example, Respondent asserts, "in order to establish that a defendant was armed with a deadly weapon, the prosecutor has no need to show that it was actually used in any manner," and supports that assertion with a quotation from *Valdez, supra*, 10 Cal.App.5th at pp. 1338, 1352-1353, "when a weapon is available to a defendant to use offensively or defensively at any time during the actual or constructive possession of that weapon within the time period for which a defendant was charged, the defendant was armed." But *Valdez* did not involve a deadly weapon, but rather a statute proscribing a "sharp instrument in prison." *Valdez* focused on whether an inmate was *armed* with the instrument if it was not found on his person. Respondent's assertion is correct that a finding of "armed" does not require use; but Respondent bootstraps that statement to the unsupported contention as to the definition of "deadly weapon."

Further, to the extent that Respondent contends that the term "deadly weapon" has a different definition depending on whether it is used in an

12

offense (e.g., section 245) or a sentencing allegation (e.g., section 667(e)(2)(C)(iii)), we find no support for that contention. Courts have not changed the definition of deadly weapon depending on the context of the issue presented. Compare *Aguilar* (section 245) and *Perez* (section 1170.126). In *Perez, supra,* 4 Cal.5th at p. 1067–1068, the Court specifically rejected such a suggestion:

> "The trial court also expressed doubt as to whether the voters who enacted Proposition 36 intended the term 'deadly weapon' in section 1170.12(c)(2)(C)(iii) to include objects that, unlike firearms, are not inherently deadly weapons. To the extent that the trial court was interpreting the meaning of the statute, we independently review the trial court's determination and reject its interpretation of section 1170.12(c)(2)(C)(iii). We presume the electorate, when it enacts an initiative, is ' "aware of existing laws and judicial construction thereof." ' [Citation.] Our decision in *Aguilar*, which defined 'deadly weapon' to include objects used in a manner capable of producing and likely to produce great bodily injury, was filed in 1997, long before the enactment of Proposition 36."

The *Perez* Court specifically stated, "[w]e see no reason why the term 'deadly weapon' would mean anything different in section 1170.12(c)(2)(C)(iii) than what it means in section 245, subdivision (a)." (*Perez, supra,* 4 Cal.5th at p. 1065.)

Finally, the "use" of the object must have occurred during the commission of the offense, not at some other point in time. Section 667, subdivision (e)(2)(C)(iii) specifies: *"During the commission of the current offense*, the defendant . . . was armed with a firearm or deadly weapon (italics added). In *People v. Bradford* (2014) 227 Cal.App.4th 1322 (*Bradford*), the court reiterated: "[t]he eligibility criteria [under section 667, subdivision (e)(2)(C)(iii)] refer[s] to something that occurs '[d]uring the commission of the current offense,' " *Bradford*, at p. 1332. Here, the relevant "current offense"

13

was Newton's conviction for resisting Morrison by force or violence (the offense of conviction). Newton's brandishment of the knife during his altercation with the dog-walker (the offense for which he was acquitted) is not evidence of conduct "during the commission of the current offense."

B.   *The Evidence was Insufficient to Support the Jury's True Finding on the Deadly Weapon Allegation.*

Having concluded that the deadly weapon allegation must be based on a finding that the knife was "used" in a manner capable of causing and likely to cause death or great bodily injury when Newton resisted Morrison, we turn to whether the evidence was sufficient to support the jury's true finding under that standard.

The undisputed evidence at trial was that Newton told Morrison he had a knife in his back pocket; the knife remained in his back pocket during Newton's altercation with Morrison; Morrison never saw a knife; and a knife was in fact found in Newton's back pocket after he had been arrested.

Respondent argues that the evidence was sufficient. Newton knew about the knife and had ready access to the knife. By brandishing it to Patterson, Respondent argues that the evidence established that Newton "possessed it for use as a weapon."

But once again, that the knife *could have* been used as a weapon (as opposed to being used to peel oranges or open envelopes) is not the relevant issue. The jury was charged with determining whether the knife was, in fact, used in a dangerous manner during the commission of the offense against Morrison. "[S]peculation without record support as to how the object could have been used or what injury might have been inflicted if the object had been used differently is not appropriate." (*In re B.M.* (2018) 6 Cal.5th 528, 530 (*B.M.*).)

14

In *Bradford, supra,* 227 Cal.App.4th 1322, the court found that in a petition for resentencing under section 1170.126, the evidence was insufficient to support a finding under section 667, subd. (e)(2)(C)(iii), because the alleged "deadly weapon," wire cutters, were discovered after the fact of the crimes. "Under the circumstances, the trial court could not conclude that petitioner was armed with a deadly weapon. No facts establish that the wire cutters were designed for use as a weapon, they were not used as a weapon, and there is no evidence to clearly establish they were being carried for use as a weapon." (*Bradford,* at pp. 1342-1343 (footnote omitted); see also, *B.M., supra,* 6 Cal.5th at p. 530 ["We conclude that the evidence here was insufficient to sustain a finding that the knife at issue was used as a deadly weapon."].)

There is no evidence from which the jury could have concluded that Newton "used" the knife "in such a way that it [was] capable of causing and likely to cause death or great bodily injury." Because the evidence was insufficient to support the jury's finding that the knife Newton carried on his person constituted a deadly weapon (§§ 667, subd. (e)(2)(C)(iii), 1170.12, subd. (c)(2)(C)(iii)), we remand for resentencing.

C.  *Award of Presentence Credits*

Newton next challenges the award of presentence credits and asks us to remand the matter for recalculation. He contends the sentencing hearing transcript, sentencing minutes, and abstract of judgment contain different numbers of credits, and the record is inadequate to determine the correct number. Newton also contends two amendments to section 4019, which took effect while his case was pending and extended eligibility for conduct credits to pretrial detainees undergoing treatment for restoration to competence in

15

county jails or state hospitals,[4] entitle him to conduct credits for his second period of confinement in a state hospital, but the trial court did not award any. The People agree the record is inadequate to determine the correct number of presentence credits to which Newton is entitled and remand is needed for recalculation. But they disagree he is entitled to conduct credits for the entire period of his second confinement in a state hospital and contend such credits should be awarded only for the portion of the period on or after the effective date of the amendment that expressly extended conduct credits to detainees undergoing treatment for restoration to competence in state hospitals.

We agree with the parties the record is inadequate to determine the correct number or presentence credits to which Newton is entitled. The trial court awarded different numbers of credits at the sentencing hearings, in the

---

[4] The first amendment extended conduct credits to persons "confined in or committed to a county jail treatment facility." (§ 4019, former subd. (c)(8), as amended by Stats. 2018, ch. 1008, § 5; see *People v. Orellana* (2022) 74 Cal.App.5th 319, 333.) The second amendment extended conduct credits to persons "confined in or committed to a state hospital or other mental health treatment facility, or to a county jail treatment facility." (§ 4019, subd. (c)(8), as amended by Stats. 2021, ch. 599, § 3; see *Orellana*, at p. 333.) Newton contends the entire period of his second confinement in a state hospital occurred after the effective date of the first amendment and part of the period occurred before the effective date of the second amendment. He argues the constitutional guarantee of the equal protection of the laws (U.S. Const., 14th Amend., § 1; Cal. Const., art. I, § 7, subd. (a)) requires he be given conduct credits for the entire period because those receiving treatment in state hospitals are similarly situated to those receiving treatment in county jails and so must be treated alike. The Courts of Appeal have reached different conclusions on whether the equal protection guarantee requires that a person confined in a state hospital after the first amendment took effect but before the second amendment took effect be given conduct credits. (See *People v. Shkrabak* (2023) 89 Cal.App.5th 943, 947–952 [yes]; *People v. Yang* (2022) 78 Cal.App.5th 120, 128–138 [yes]; *Orellana*, at pp. 339–342 [no].)

sentencing minutes, and in the abstract of judgment. The probation officer's sentencing recommendation filed before Newton's second confinement at a state hospital listed dates of confinement and corresponding actual custody and conduct credits. The recommendation filed after the second confinement merely repeated that information; it did not list dates of the second confinement, did not update any of the credits, and stated no credits under section 4019 were available for the period of confinement in a state hospital. The certificate of restoration of mental competence after the second confinement in a state hospital listed the date of admission but no date of discharge. There is no information in the record about Newton's compliance with the labor and behavior requirements for conduct credits. (See § 4019, subds. (b), (c).) Under these circumstances, we deem it appropriate to remand the matter to allow the parties and the probation officer to make a record regarding presentence custody and conduct credits and to allow the trial court to determine the number of credits. As part of its determination, the court shall decide whether Newton is entitled to section 4019 credits for all or any part of his second period of confinement in a state hospital to regain mental competence. (See fn. 4, *ante*.)

## IV.

## DISPOSITION

The jury's true finding on the allegation that Newton was armed with a deadly weapon in the commission of count two is reversed for insufficient evidence. The three strikes sentence is reversed and the matter is remanded to the trial court for resentencing and for recalculation of presentence custody and conduct credits consistent with this opinion. In all other respects, the judgment is affirmed.

KELETY, J.

I CONCUR:


BUCHANAN, J.

18

IRION, Acting P. J., Concurring and Dissenting.

I agree with the majority the award of presentence custody and conduct credits must be vacated and the matter remanded for a recalculation of those credits. I disagree, however, the judgment must be reversed and the matter remanded for resentencing based on insufficiency of the evidence to support the jury's true finding on the arming allegation that triggered the third strike prison term.

I

The majority concludes Brian Joseph Newton was not armed with a deadly weapon during his commission of the offense of resisting an executive officer by force or violence because he did not use his pocketknife in a way capable of causing death or great bodily injury while he scuffled with Deputy Sheriff Morrison. According to the majority, "in defining 'deadly weapon,' whether for purposes of a statute or an enhancement, if the object is not inherently dangerous, the evidence must show that the defendant *used* the object as a weapon, i.e., in a manner that was capable of causing death or great bodily injury." (Maj. opn., *ante*, p. 11.) The majority also says, "[T]he 'use' of the object must have occurred during the commission of the offense, not at some other point in time." (Maj. opn., *ante*, p. 14.) In my view, the majority's rule is inconsistent with the language and intent of the "Three Strikes" law, contradicts a long line of cases, and produces absurd results the voters could not have intended.

A

I begin with the inconsistency between the majority's interpretation of the statutory provision at issue ("the arming provision") and the language of that provision. Under the Three Strikes law as amended by the Three Strikes Reform Act, a defendant with two prior serious or violent felony

convictions who commits a current felony that is neither serious nor violent is nevertheless subject to a third strike sentence if "[d]uring the commission of the current offense, the defendant used a firearm, was armed with a firearm or deadly weapon, or intended to cause great bodily injury or death to another person." (Pen. Code, § 1170.12, subd. (c)(2)(C)(iii), as amended by Prop. 36, as approved by voters, Gen. Elec. (Nov. 6, 2012).)[1] From this language, it is apparent that "used" is not the same as "was armed." (*Ibid.*) Different words used in the same statute mean different things. (See, e.g., *People v. Albillar* (2010) 51 Cal.4th 47, 56 [" ' "[W]hen different words are used in contemporaneously enacted, adjoining subdivisions of a statute, the inference is compelling that a difference in meaning was intended." ' "]; *In re Austin P.* (2004) 118 Cal.App.4th 1124, 1130 ["When different terms are used in parts of the same statutory scheme, they are presumed to have different meanings."].) "The juxtaposition of the two phrases so close together indicates that the phrases have different meanings." (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 640.) By interpreting the arming provision to require a defendant use an object that is not inherently dangerous in a dangerous manner for the defendant to be armed within the meaning of the provision, the majority eliminates the statutory distinction between use and arming. (Cf. *People v. Chambers* (1972) 7 Cal.3d 666, 672

---

[1] Subsequent undesignated section references are to the Penal Code. "The Three Strikes law consists of two nearly identical statutory schemes. [Citation.] The first was enacted by the Legislature in March 1994, and appears in section 667 (as amended by Stats. 1994, ch. 12, § 1, p. 71). The second was adopted by ballot initiative several months later and appears in section 1170.12. Both were amended by Proposition 36. [Citation.] The differences between the statutes are immaterial for the purposes of this case, so for convenience [I] refer only to section 1170.12." (*People v. Estrada* (2017) 3 Cal.5th 661, 666, fn. 2.)

["By employing the term 'uses' instead of 'while armed' the Legislature requires something more than merely being armed."].)

The majority's interpretation also violates the rule that a statute be read so that no language is inoperative or superfluous. (See, e.g., *People v. Valencia* (2017) 3 Cal.5th 347, 357; *Barron v. Superior Court* (2023) 90 Cal.App.5th 628, 640; *People v. Trimble* (1993) 16 Cal.App.4th 1255, 1259.) The majority leaves no work for the arming provision to do when the object with which the defendant was armed was not inherently dangerous, such as the knife at issue here. The arming provision applies when a defendant has two or more prior serious or violent felony convictions *and the current felony conviction is neither serious nor violent*. (§ 1170.12, subds. (b)(1), (c)(2)(C)(iii); *People v. Johnson* (2015) 61 Cal.4th 674, 689–690.) Under the majority's interpretation, the arming provision applies to a defendant armed with an object other than an inherently dangerous one only if during the commission of a felony "the defendant *used* the object as a weapon, i.e., in a manner that was capable of causing death or great bodily injury." (Maj. opn., *ante*, p. 11.) Such a felony would be one "in which the defendant personally used a dangerous or deadly weapon," which is a "serious felony." (§ 1192.7, subd. (c)(23).) A defendant who commits a serious felony and has two or more prior strikes would be subject to a third strike prison term *regardless of the arming provision*. (§ 1170.12, subd. (c)(2)(A); *Johnson*, at p. 690.) Because the majority's interpretation of that provision makes it unnecessary, useless, or redundant, it must be avoided. (*Kleffman v. Vonage Holdings Corp.* (2010) 49 Cal.4th 334, 345; *People v. Jennings* (2019) 42 Cal.App.5th 664, 672.)

Additionally, the majority's interpretation of the arming provision as requiring use for objects that are not inherently dangerous but can be used as deadly weapons undermines the purpose of the provision. In enacting the

3

Three Strikes Reform Act, "the voters intended a third strike defendant who committed a current, nonviolent and nonserious crime would not be punished as severely as a third strike defendant whose current crime was violent and/or serious. Nonetheless, the voters also intended to exclude those defendants who committed the current nonviolent and nonserious crime *in a manner that potentially could result in violent and/or serious consequences*, which intent is manifest in the triad of disqualifying factors. . . . [¶] To this end, Proposition 36 disqualifies from resentencing those defendants whose current crime is nonviolent and nonserious but, during its commission, the defendant used a firearm, *was armed with a* firearm or *deadly weapon*, or intended to inflict great bodily injury on another." (*People v. Newman* (2016) 2 Cal.App.5th 718, 724–725, italics added (*Newman*).) "Felons in possession of weapons and who have them readily available for use at any time during the possession are obviously dangerous" (*People v. Valdez* (2017) 10 Cal.App.5th 1338, 1357, italics omitted) even if they do not use the weapons, because the availability of the weapons during the offenses "creat[es] a potential for death or injury" (*People v. Reaves* (1974) 42 Cal.App.3d 852, 856–857). The majority's rule that such felons are not subject to third strike prison terms if they have two or more prior strikes frustrates the voters' intent to punish dangerous felons more severely than nondangerous ones.

## B

Case law, too, is inconsistent with the majority's interpretation of the arming provision as requiring use of an object in a manner capable of causing death or great bodily injury during a felony if the object is not inherently dangerous.

4

A leading case on the distinction between *use* of a weapon and *being armed* with one is *People v. Bland* (1995) 10 Cal.4th 991 (*Bland*), where the Supreme Court considered the different language in firearm enhancement statutes. " 'By employing the term "uses" instead of "while armed" the Legislature requires something more than merely being armed. . . . "Use" means, among other things, "to carry out a purpose or action by means of," to "make instrumental to an end or process," and to "apply to advantage." ' " (*Id.* at p. 997.) "In contrast, *arming* under the sentence enhancement statutes does not require that a defendant utilize a firearm or even carry one on the body. A defendant is *armed* if the defendant has the specified weapon available for use, either offensively or defensively." (*Ibid.*)

One case the Supreme Court cited to illustrate the meaning of arming was *People v. Martinez* (1984) 150 Cal.App.3d 579 (*Martinez*). (*Bland, supra,* 10 Cal.4th at p. 997–998.) In *Martinez*, Israel Chavez and Manuel Martinez committed crimes in the home of Donald and Martha Goodfellow. After Chavez forced his way into the home by holding a screwdriver to Donald's back, Martinez "entered and took control of Donald by holding his own screwdriver to Donald's neck." (*Martinez*, at p. 586.) Chavez pushed his screwdriver against Martha's neck while he raped her and left the screwdriver on the bed when he had finished. (*Id.* at pp. 586, 605.) Martinez then raped Martha while Chavez's "screwdriver lay on the bed, somewhere between [Martha's] knees and feet." (*Id.* at p. 605.) The Court of Appeal held that although "Martinez neither used nor carried a screwdriver while committing the rape," he was armed with a deadly weapon during the rape because Chavez's screwdriver was " 'available' to him in case [Martha] needed further 'persuasion' to submit to his assaults." (*Ibid.*)

5

Courts have considered various objects that are not inherently dangerous and were not used during crimes in ways capable of causing death or great bodily injury and have rejected sufficiency of the evidence challenges to findings that defendants were armed. For example, this court upheld a finding the defendant was armed with a deadly or dangerous weapon during a robbery when the victim, mistakenly believing a hammer the defendant had in his pocket was a gun, handed over money when the defendant said, " 'This is a stick-up.' " (*People v. McKinney* (1952) 111 Cal.App.2d 690, 692–693.) Although there was "no evidence that [the defendant] made any threatened or actual use of [the hammer]," it could "be reasonably inferred from the evidence as a whole that the [defendant] intended to use the hammer as a weapon if it became necessary." (*Id.* at p. 693.) Similarly, a defendant was armed with a deadly weapon during a rape when he possessed "a three-pronged metal fork" and it could " ' "be fairly inferred from the evidence that [he] intended on a particular occasion to use it as a weapon should the circumstances require." ' " (*People v. Moran* (1973) 33 Cal.App.3d 724, 730, italics omitted (*Moran*).)

Several courts have upheld a finding that a defendant was armed with a dangerous or deadly weapon when the object involved was a knife of which no use was made during the crime. A defendant who had "a fishing-style knife" in his back pocket while he forcibly orally copulated the victim was held to be "armed with . . . a deadly weapon" (§ 12022.3, subd. (b)). (*People v. Stiltner* (1982) 132 Cal.App.3d 216, 229–230 (*Stiltner*).) The court ruled: "The statute at issue does not require a defendant actually use the weapon for offense or defense, just that he carry it in a manner available for such use." (*Id.* at p. 230.) Similarly, an armed finding was upheld when the "defendant had upon his person a hunting knife encased in a holster" during

6

a robbery, but "[n]o attempt was made to threaten the victim with this knife or to make use of the knife." (*People v. Elliott* (1977) 70 Cal.App.3d 984, 988 (*Elliott*).) The statute at issue did "not require that a defendant 'use' a dangerous or deadly weapon"; rather, it sufficed that the " 'defendant had a [knife] in his possession at the time the robbery took place.' " (*Id.* at p. 989.)

In *People v. Cloninger* (1958) 165 Cal.App.2d 86, 87 (*Cloninger*), the defendant disclosed a burglary plan to a man and said he would "mutilate" the intended victim and "stick him in the leg." Twelve days later, defendant went to the crime scene with a hatchet in his hand and a knife in his pocket. (*Ibid.*) After the defendant broke into the place, he was apprehended by police officers who had been tipped off by the man to whom the defendant disclosed the burglary plan. (*Id.* at pp. 87–88.) In rejecting the defendant's challenge to the sufficiency of the evidence to support the jury's finding he was armed with a deadly weapon, the Court of Appeal ruled: "A deadly weapon is one likely to produce death or great bodily injury. [Citations.] If it appears that the instrumentality is capable of being used in a deadly or dangerous manner and it may be fairly inferred from the evidence that its possessor intended on a particular occasion to use it as a weapon should the circumstances require, its character as a dangerous or deadly weapon may be thus established, at least for the purposes of that occasion." (*Id.* at p. 88.) Because the defendant "clearly expressed his intent to use the hatchet and the knife during the commission of burglary which he intended to commit, if the occasion should arise," he "was armed with a deadly weapon, both the hatchet and the knife being such under the circumstances." (*Ibid.*)

A more recent case involving a knife and the arming provision at issue here is *People v. Cruz* (2017) 15 Cal.App.5th 1105 (*Cruz*). Cruz, who had two prior strike convictions, forced his way into the victim's home, grabbed a

kitchen knife, and threatened to stab the victim. (*Id.* pp. 1108–1109.) "He had ready access to other knives as well." (*Id.* at p. 1108.) The jury found Cruz guilty of false imprisonment and found not true an allegation he personally used a deadly or dangerous weapon (a knife) in committing the crime. (*Id.* at p. 1109.) Cruz argued the jury's finding of not true on the weapon use allegation rendered the arming provision inapplicable. (*Id.* at p. 1111.) The Court of Appeal disagreed. It noted "there is a crucial difference between being 'armed' with a knife and 'use' of a knife." (*Id.* at p. 1108.) Unlike the weapon use enhancement, the arming provision " 'requires a temporal nexus between the arming and the underlying felony, not a facilitative one.' " (*Id.* at pp. 1111–1112.) That nexus was satisfied even though the jury found Cruz had not used a knife to facilitate the false imprisonment, because multiple knives were available to him for use during commission of the crime. (*Id.* at pp. 1108, 1111–1112.)

The majority ignores these cases holding that use of an object that is not inherently dangerous or deadly in a manner capable of causing death or great bodily injury is not required for a defendant to be armed with a deadly weapon during the commission of an offense. Instead, the majority relies exclusively on cases involving assault with a deadly weapon for its imposition of a use requirement. Such reliance, in my view, is misplaced.

The crime of "assault upon the person of another *with a deadly weapon or instrument* other than a firearm" (§ 245, subd. (a)(1), italics added) "focuses on *use* of a deadly weapon or instrument," because " '[a]ll aggravated assaults are ultimately determined based on the force likely to be applied against a person' " (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028, 1035 (*Aguilar*)). The crime "requires the use of a deadly weapon or instrument" as an element. (*People v. Aguayo* (2022) 13 Cal.5th 974, 984 (*Aguayo*); accord, *People v. Fugit*

8

(2023) 88 Cal.App.5th 981, 988–989.) Thus, our Supreme Court has repeatedly stated: "*As used in section 245, subdivision (a)(1)*, a 'deadly weapon' is 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.' " (*Aguilar*, at pp. 1028–1029, italics added; accord, *People v. Aledamat* (2019) 8 Cal.5th 1, 6 (*Aledamat*); *In re B.M.* (2018) 6 Cal.5th 528, 532–533; *People v. Perez* (2018) 4 Cal.5th 1055, 1065 (*Perez*).) Deciding whether an object like a knife, which "can be, and usually is, used for innocent purposes" (*Aledamat*, at p. 6), is a deadly weapon *within the meaning of section 245, subdivision (a)(1)* "does not permit conjecture as to how the object could have been used" but "must rest on evidence of how the defendant actually 'used' the object" (*In re B.M.*, at p. 534). Cases that require a focus on how an object is used to determine whether it is a deadly weapon do not control the determination whether an object that is not actually used is a deadly weapon for purposes of the arming provision, which requires availability for use, not actual use. (See *People v. Hall* (1930) 105 Cal.App. 359, 361–362 (*Hall*) [proof the defendant was armed with a deadly weapon "does not require proof that there was an actual assault upon the person with a deadly weapon"].)

Rather, the cases I surveyed above (conc. & dis. opn., *ante*, pp. 5–8) provide the applicable rules for determining whether a defendant is armed with a deadly weapon during the commission of a crime when the alleged weapon is not inherently dangerous and is not used. As our Supreme Court recently remarked in a case holding the arming provision applies to objects that are not inherently deadly: "We presume the electorate, when it enacts an initiative, is ' "aware of existing laws and judicial construction thereof." ' " (*Perez, supra*, 4 Cal.5th at pp. 1067–1068.) Thus, the "decision in *Aguilar*,

9

which defined 'deadly weapon' *to include* objects used in a manner capable of producing and likely to produce great bodily injury" and "was filed in 1997, long before the enactment of [the arming provision]," supplies the definition to be used in cases of assault with a deadly weapon or other cases where use of an object in a way likely to cause death or great bodily injury is an element of the crime or is otherwise required by the statute at issue. (*Perez*, at p. 1068, italics added [applying *Aguilar* definition in case of assault by means of force likely to produce great bodily injury where object at issue was truck used to drag victim].) *Perez* does not define "deadly weapon" for all situations, however. The decisions I discussed earlier, which like *Aguilar* predate the enactment of the arming provision, provide the definition for cases in which the alleged weapon is not inherently deadly, is not used, and is not required to be used to commit the underlying crime or to be subject to a provision for increased punishment. In such cases, the defendant was found to be armed with a deadly weapon when the evidence showed he had available for use an object that *could be used* to cause death or great bodily injury *and* he intended to use it as a weapon *should the need ari*se. (See, e.g., *Martinez, supra*, 150 Cal.App.3d at p. 605; *Moran, supra*, 33 Cal.App.3d at p. 730; *Cloninger, supra*, 165 Cal.App.2d at p. 88.)

C

I believe the majority's interpretation of the arming provision defies common sense. That interpretation is: (1) "whether for purposes of a statute or an enhancement, if the object is not inherently dangerous, the evidence must show that the defendant *used* the object as a weapon, i.e., in a manner that was capable of causing death or great bodily injury"; and (2) "the use of the object must have occurred during the commission of the offense, not at

10

some other point in time." (Maj. opn., *ante*, pp. 11, 14.) Two examples illustrate the absurd results that follow from that interpretation.

Suppose John has two strike convictions. He breaks into an apartment where Jane and Mary live, but only Mary is home. John brandishes a butcher knife and demands Mary have sexual intercourse with him. She submits, and he puts the knife in his back pocket. After John finishes the rape, he fatally slits Mary's throat with the knife, puts it back into his pocket, and heads for the door. He finds Jane on the other side and threatens to kill her if she screams. John then forces her into the apartment, barricades her in the bathroom, and leaves. Under the majority's interpretation, John was not "armed with a . . . deadly weapon" during the false imprisonment of Jane (§ 1170.12, subd. (c)(2)(C)(iii)), because the butcher knife is not inherently deadly and he made no use of it during the false imprisonment. It does not matter under the majority's interpretation that moments earlier John used the knife to rape and kill Mary and it was within his reach when he forced Jane into the apartment and barricaded her in the bathroom.

Consider an example closer to the facts of this case. Suppose that after Denise Patterson had called 911 to report Newton's threats to kill her and her dog, he actually used his pocketknife to carry out the threats. As Newton stood over the corpses wiping the blood off the knife, Deputy Sheriff Morrison arrived in response to the 911 call and ordered Newton to stand still and put his hands in the air. Newton disobeyed the order, put the knife in his back pocket, and ran off. Morrison pursued Newton, the two scuffled, and Newton ultimately submitted to arrest. Under the majority's interpretation, Newton was not "armed with a . . . deadly weapon" while he resisted an executive officer (§ 1170.12, subd. (c)(2)(C)(iii)), because the pocketknife is not inherently deadly and Newton did not use it during the scuffle. It does not

11

matter under the majority's interpretation that moments before the scuffle, Newton used the knife to kill Patterson and her dog and it was within his reach during the scuffle with Morrison.

I submit that a statutory interpretation that produces such absurd consequences is not the one the voters had in mind when they enacted the arming provision to preserve third strike prison terms for defendants with two strikes "who committed the current nonviolent and nonserious crime in a manner that potentially could result in violent and/or serious consequences." (*Newman, supra*, 2 Cal.App.5th at p. 724.)  The majority's interpretation of the arming provision therefore, in my view, cannot be correct.  (See, e.g., *In re Haines* (1925) 195 Cal. 605, 621 ["The courts will be astute to avoid a result contrary to sound sense and wise policy."]; *People v. Mendoza* (2023) 88 Cal.App.5th 287, 296 ["We also must avoid interpretations that lead to absurd results."].)

## II

I believe the correct interpretation of "armed with . . . a deadly weapon" (§ 1170.12, subd. (c)(2)(C)(iii)) as it applies to this case is this:  When an object alleged to be a deadly weapon is not inherently deadly, the defendant must have the object available for use during the commission of a felony, the object must be capable of use in a way likely to cause death or great bodily injury, and the evidence must show the defendant intended to use the object as a weapon should the circumstances require.[2]  Under this interpretation,

---

[2]    The requirement of evidence the defendant intended to use the object as a weapon should the need arise (*People v. Burton* (2006) 143 Cal.App.4th 447, 457 (*Burton*); *People v. Raleigh* (1932) 128 Cal.App. 105, 108–109 (*Raleigh*)) assuages the majority's concern that without an actual use requirement, a "reader of this opinion" who has "in close proximity a pencil; a pair of scissors; a heavy paperweight or bookend; or a screwdriver" would be "armed with a deadly weapon."  (Maj. opn., *ante*, p. 12.)

12

the evidence was sufficient to support the jury's finding Newton was armed with a deadly weapon when he resisted an executive officer.

A

As used in the arming provision, " '[a]rmed' . . . means furnished or equipped with weapons of offense or defense." (*Hall, supra*, 105 Cal.App. at p. 361.) To be "armed" means to have a weapon "available for use, either offensively or defensively." (*Bland, supra*, 10 Cal.4th at p. 997; accord, *Cruz, supra*, 15 Cal.App.5th at p. 1110.) Use of a weapon is not required for arming. (*Bland*, at p. 997; *Cruz*, at p. 1111; *Stiltner, supra*, 132 Cal.App.3d at p. 230; *Elliott, supra*, 70 Cal.App.3d at p. 989.)

As used in the arming provision, "[a] deadly weapon is one likely to produce death or great bodily injury." (*People v. Fuqua* (1881) 58 Cal. 245, 247; accord, *People v. Jaramillo* (1979) 98 Cal.App.3d 830, 837; see *People v. Pruett* (1997) 57 Cal.App.4th 77, 85 (*Pruett*) [" 'deadly' *means* " 'likely to cause or *capable* of causing death' "].) In a case decided nearly a century ago, the Court of Appeal described two classes of deadly weapons. (*Raleigh, supra,* 128 Cal.App. at p. 108.) The first class includes inherently deadly weapons, which are deadly to others in the ordinary use for which they are designed, such as "guns, dirks, and blackjacks." (*Ibid.*) The second class includes objects that are not designed for use as weapons but may be used as such, and includes "ordinary razors, *pocketknives*, hat pins, canes, hammers, hatchets, and other sharp or heavy objects." (*Ibid.*, italics added.) When it appears an object of the second class "is capable of being used in a 'dangerous or deadly' manner, and it may be fairly inferred from the evidence that its possessor intended on a particular occasion to use it as a weapon should the circumstances require, we believe that its character as a 'dangerous or deadly weapon' may be thus established, at least for the purposes of that occasion."

(*Id.* at pp. 108–109.)  Thus, deadly weapons include "instruments which are designed to be lethal" and "dangerous implements which can be used in a lethal way."  (*People v. Brookins* (1989) 215 Cal.App.3d 1297, 1307 (*Brookins*).)

Once the deadly character of the object is established, "it is immaterial whether [the object] is used or even exposed to view" for purposes of arming.  (*Raleigh, supra*, 128 Cal.App. at p. 109.)  If the object is dangerous or deadly in the ordinary use for which it is designed, it is a dangerous or deadly weapon as a matter of law.  (*Id.* at p. 110.)  If the object is designed for innocuous uses but may be used in a dangerous or deadly way, the jury determines whether the dangerous or deadly character of the object has been established.  (*Ibid.*)  "If from all the facts and circumstances the jury is convinced beyond a reasonable doubt that the [object] was one which, in the hands of the perpetrator of the [crime], was capable of being used in a 'dangerous or deadly' manner, and that the perpetrator of the [crime] intended to use it as a 'weapon' should the circumstances require, then the character of the particular instrumentality is established as a 'dangerous or deadly weapon.' "  (*Ibid.*)

Our Supreme Court repeatedly has approved the rules laid down in *Raleigh, supra*, 128 Cal.App. 105, for deciding whether an object that has innocuous uses but may be used in a deadly manner constitutes a deadly weapon.  (See *People v. Graham* (1969) 71 Cal.2d 303, 327–329 (*Graham*); *People v. Morlock* (1956) 46 Cal.2d 141, 145–146; *People v. McCoy* (1944) 25 Cal.2d 177, 188–189; *People v. Cook* (1940) 15 Cal.2d 507, 516–517; see also *Pruett, supra*, 57 Cal.App.4th at p. 85 [noting "the *Raleigh* definition of 'deadly weapon' " was "adopted by the Supreme Court for assault with a deadly weapon in *McCoy* and reinforced for robbery committed with a deadly

14

weapon in *Graham*"].)  The Courts of Appeal have done likewise.  (See, e.g., *People v. Baugh* (2018) 20 Cal.App.5th 438, 445 (*Baugh*); *Burton, supra,* 143 Cal.App.4th at p. 457; *Moran, supra*, 33 Cal.App.3d at p. 730; *Cloninger, supra*, 165 Cal.App.2d at p. 88 [citing *Morlock*, which cited *Raleigh*].)  The *Raleigh* opinion has been "described in a leading text as 'definitive.' " (*Brookins, supra*, 215 Cal.App.3d at p. 1305, citing 2 Witkin & Epstein, Cal. Crim. Law (2d ed. 1988) Crimes Against Property, § 637, p. 717.)  I follow *Raleigh* in this case.

B

Applying my interpretation of the arming provision, I conclude the evidence was sufficient to support the jury's finding Newton was armed with a deadly weapon while he resisted an executive officer.  As the majority correctly states:  "The jury reasonably could conclude that during commission of the crime Newton knew the knife was 'available for use' [citation] based on his admission to Morrison that he had a knife in his back pocket, Morrison's description of the struggle when he tried to detain Newton, and the parties' stipulation that during a subsequent search a knife was found in Newton's back pocket.  The jury reasonably could conclude the knife could have been used 'either offensively or defensively' [citation] based on Patterson's testimony Newton threatened to cut or kill her and her dog while he held a knife in his hand and his testimony he had the knife 'out' during the encounter with her and twice warned her that he 'would protect [him]self against her dogs.' " (Maj. opn., *ante*, pp. 8–9.)  The evidence thus established Newton was "armed" with the knife during the crime.  (See *Bland, supra*, 10 Cal.4th at p. 997; *Cruz, supra*, 15 Cal.App.5th at pp. 1109–1110.)

Unlike the majority, however, I think the evidence also sufficiently established the deadly character of the knife.  A photograph introduced into

15

evidence at trial showed the knife had a pointed blade that was between one and one-half inches long. "Nearly all knives have sharp edges and points which are *designed* to cut things, and knives can be—and all too often are—employed to cut—and kill—people. Jurors can certainly employ common sense and experience to determine whether or not such a knife is a 'deadly' instrument." (*Pruett, supra*, 57 Cal.App.4th at p. 86.) An object such as Newton's pocketknife, which "could be used to slice a victim's throat, wrist, or other vital spot, and thus . . . has a reasonable potential of causing great bodily injury or death," qualifies as a deadly weapon. (*People v. Pollock* (2004) 32 Cal.4th 1153, 1178.) Based on Newton's threats and warnings to Patterson while holding the knife, the jury reasonably could find he "intended to use it as a 'weapon' should the circumstances require." (*Raleigh, supra*, 128 Cal.App. at p. 110; see *Martinez, supra*, 150 Cal.App.3d at p. 605 [defendant's earlier holding of screwdriver against neck of one victim to subdue him showed intent to use screwdriver that lay on bed during rape of other victim as weapon if needed to subdue her]; *Cloninger, supra*, 165 Cal.App.2d at p. 88 [defendant's statement 12 days before burglary that he would "mutilate" victim and "stick him in the leg" indicated defendant's intent to use as weapon knife he took in his pocket to crime scene].) His "possessing the [knife] with the intent to use it as a dangerous or deadly weapon *should the circumstances require* amount[ed] to illegally possessing it as such" (*Baugh, supra*, 20 Cal.App.5th at p. 445) and subjected him to a third strike prison term (§ 1170.12, subd. (c)(2)(C)(iii)).

C

Newton's contentions the evidence was insufficient to support the jury's finding he was armed with a deadly weapon while resisting Morrison are unpersuasive.

In his opening brief, Newton contends the evidence was insufficient because during his scuffle with Morrison "the knife never left [his] back pocket, and consequently he did not use the knife in a manner likely to cause great bodily injury or death." As I have explained in part I of this opinion, however, the arming provision does not require use of the knife in a deadly manner. Rather, " '[i]t is the availability—the ready access—of the weapon that constitutes arming.' " (*Bland, supra*, 10 Cal.4th at p. 997; accord, *Cruz, supra*, 15 Cal.App.5th at p. 1110.) Like the majority, Newton relies exclusively on cases concerning assault with a deadly weapon to support his contention that use of the knife during the scuffle with Morrison was required for him to be armed with a deadly weapon.[3] Such reliance is misplaced, for the reasons I set out above. (Conc. & Dis. opn., *ante*, pp. 8–10.)

In his reply brief, Newton contends the jury could not have found the arming allegation true under the instructions it was given on what

---

[3] In one case, the court decided what standard for harmless error applied to a claim of instructional error on whether a box cutter constituted a deadly weapon for purposes of assault with a deadly weapon. (*Aledamat, supra*, 8 Cal.5th at p. 3.) In two other cases, courts reversed assault with a deadly weapon convictions for insufficient evidence that a knife was used as a deadly weapon. (*In re B.M., supra*, 6 Cal.5th at p. 536 [no evidence minor's use of butter knife against victim's blanketed legs was likely to produce death or great bodily injury]; *In re Brandon T.* (2011) 191 Cal.App.4th 1491, 1496–1498 [butter knife that broke during assault was not, as used, capable of producing death or great bodily injury].) In three other cases, courts held the evidence sufficient to sustain assault with a deadly weapon convictions when the defendant used a knife to cut or stab the victim. (*People v. Herd* (1963) 220 Cal.App.2d 847, 849–850 [victim required "hospitalization for nine days" for "large cut . . . from which 'some of her intestines or something was protruding' "]; *People v. Kersey* (1957) 154 Cal.App.2d 364, 365–366 [stabbing victim "require[d] hospitalization and an operation"]; *People v. Arguilida* (1948) 85 Cal.App.2d 623, 625 [stabbing victim "bled profusely" and "was taken to a hospital . . . for a week"].)

constitutes a deadly weapon. The trial court instructed the jury with CALCRIM No. 3130 that "[a] deadly weapon is any object, instrument, or weapon that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury." (Maj. opn., *ante*, fn. 2.) Newton argues that under the instruction "only two facts were submitted to the jury to support the arming enhancement . . . : (1) the keychain knife was 'inherently deadly,' and (2) [he] used the knife in a way that was capable of causing and likely to cause death or great bodily injury. [Citations.] Neither of those facts was proved to the jury beyond a reasonable doubt." "Because there was no substantial evidence to support the findings the jury made to support the arming enhancement," Newton contends, "his third strike cannot stand." I disagree.

The instruction on the arming allegation, though not tailored so precisely to the facts of this case as it could and should have been, did not require the jury to make any finding that was not supported by the evidence in order to find the arming allegation true. The instruction should not have included "inherently deadly" as part of the definition of "deadly weapon," because a pocketknife has innocent uses and is not deadly per se. (*Aledamat, supra*, 8 Cal.5th at p. 6.) The definition also should have stated a deadly weapon includes an object that is "capable of being used" in a way that is likely to cause death or great bodily injury, rather than "is used" in that way (CALCRIM No. 3130; see maj. opn., *ante*, fn. 2), because arming requires availability for use, not actual use (*Bland, supra*, 10 Cal.4th at p. 997; *Cruz, supra*, 15 Cal.App.5th at pp. 1109–1110; *Elliott, supra*, 70 Cal.App.3d at p. 989).[4] Newton has not assigned either of these instructional imprecisions

---

4    An instruction on the meaning of "deadly weapon" more suitable for this case would have been this: " 'A deadly weapon means any weapon,

as reversible error, however. He claims only that as instructed the jury could not find the arming allegation true because the evidence was insufficient. When the instruction is read as a whole and in the context of the evidence and closing arguments, as it must be (*People v. Foster* (2010) 50 Cal.4th 1301, 1335; *People v. Marsh* (2019) 37 Cal.App.5th 474, 490–491; *People v. Martin* (1983) 150 Cal.App.3d 148, 158), I conclude the jury could find the allegation true based on the evidence presented at trial.

In giving the instruction on the arming allegation, the trial court not only defined "deadly weapon" as an object "that *is used* in such a way that it is capable of causing and likely to cause death or great bodily injury," but also instructed the jury that "[a] person is armed with a deadly weapon" when he knowingly "[c]arries a deadly weapon or has a deadly weapon *available for use* in either offense or defense in connection with the crimes charged." (CALCRIM No. 3130, italics added; see maj. opn., *ante*, fn. 2.) The evidence

instrument or object that is capable of being used to inflict death or great bodily injury and it is shown that the possessor intended to use it as a weapon should the circumstances require. It is not necessary that such weapon be in fact used or visible.' " (*People v. Harrison* (1970) 5 Cal.App.3d 602, 608 [describing instruction as "adequate" for use when issue was whether defendant was armed with deadly weapon during commission of burglary]; see *Graham, supra*, 71 Cal.2d at p. 328, fn. 11 [directing trial court on retrial of first degree robbery charge to instruct jury that to find defendant was armed with a deadly or dangerous weapon, the jury had to find that "at least one of the perpetrators of the robbery possessed an instrumentality which was capable of being used by him in a dangerous or deadly manner" and "its possessor intended to use the instrumentality in the robbery as a weapon of offense or defense should the circumstances require"].) The Advisory Committee on Criminal Jury Instructions may wish to consider recommending the Judicial Council of California approve revisions to CALCRIM No. 3130 to include language like that approved in *Graham* and *Harrison* for use in cases where the alleged weapon is not inherently deadly and was not used during the commission of the crime in which the defendant was allegedly armed.

19

was undisputed that Newton knew he had a knife in his back pocket and did not use it during the scuffle with Morrison. In closing arguments, the prosecutor urged the jury to find the arming allegation true because Newton knew he had a knife in his possession while he was resisting Morrison. Newton's counsel argued the People had not met their burden of proof because they did not produce the knife for the jury to inspect or any evidence about its sharpness. The prosecutor responded the jury could tell from the photograph of the knife that it could be used to stab or otherwise to cause great bodily injury. The parties thus focused the jury's attention on the possession and injury-producing capability of the knife, not its use. Finally, during deliberations, the jury asked the court: "Based on [CALCRIM No.] 3130[,] [d]o we need to find [d]efendant ([t]rue or false) of *being in possession of deadly weapon*, [i]f the count is found as NOT [g]uilty, or do we fill out for both count[s] 1 [and] 2 [r]egardless of [g]uilty or [n]ot [g]uilty?" (Italics added.)

Based on the trial record and the presumption jurors are intelligent persons who can understand and correlate instructions and apply them to the facts of the case (*People v. Carey* (2007) 41 Cal.4th 109, 130; *People v. Campbell* (2020) 51 Cal.App.5th 463, 493; *People v. Adams* (2009) 176 Cal.App.4th 946, 954), I conclude the jury understood the arming allegation required the People to prove Newton knowingly *possessed* a knife that was available for use either offensively or defensively in a way likely to cause death or great bodily injury while he was resisting Morrison, *not* that he actually *used* it in that way. I believe legally sufficient evidence supports that finding. (Conc. & Dis. opn., *ante*, pt. II.B.)

20

## III

I dissent from the majority's decision to reverse the judgment and to remand the matter for resentencing, based on insufficiency of the evidence to support the jury's finding Newton was armed with a deadly weapon while he resisted an executive officer.  I would vacate the award of presentence credits and remand the matter for the limited purpose of recalculating those credits.


IRION, Acting P. J.

21