Filed 1/27/25  P. v. Carolus CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B332065 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA098903) |
| v. | |
| ANDREW MICHAEL CAROLUS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael V. Jesic, Judge.  Affirmed.

Christopher Stansell, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Stephanie C. Brenan and Sophia A. Lecky, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

In March 2023, defendant Andrew Michael Carolus was unhoused and living in an encampment. He attacked Thomas W. while Thomas and his fiancée, Cheryl H.[1] were inside an adjacent tent. Carolus stabbed through the tent with a knife, bit Thomas, and bludgeoned him with an unknown object. A jury convicted Carolus of assault with a deadly weapon (Pen. Code,[2] § 245, subd. (a)(1)), and the trial court sentenced Carolus to two years in state prison.

On appeal, Carolus argues the trial court prejudicially erred in failing to instruct the jury sua sponte (as Carolus made no such request) as to the lesser included crime of simple assault and as to the definition of "deadly weapon." We conclude that the trial court did not err in failing to instruct on simple assault because no substantial evidence supported such an instruction. As to the definition of "deadly weapon," even if the court erred in failing to give such an instruction, the court's failure to do so was harmless beyond a reasonable doubt. We thus affirm.

---

[1] The information identifies the victim of the count 2 assault as Sheryl H., the name Thomas's fiancée provided at the preliminary hearing. Because both parties refer to her as Cheryl H. on appeal, we also do so for purposes of consistency. We refer to Cheryl and Thomas by their first names in accordance with California Rules of Court, rule 8.90(b)(4) and do not intend any disrespect.

[2] Further statutory references are to the Penal Code unless otherwise specified.

# FACTUAL AND PROCEDURAL BACKGROUND

## A. The Information

The information charged Carolus with assault with a deadly weapon, to wit a knife, upon Thomas (§ 245, subd. (a)(1); count 1) and assault by means likely to commit great bodily injury upon Cheryl (*id*., subd. (a)(4); count 2). The information alleged as aggravating circumstances that Carolus's violent conduct indicated a serious danger to society and that he committed the offenses while he was on probation.

## B. The Trial

### 1. *Prosecution Evidence*

Thomas and Los Angeles Police Department (LAPD) officers Tien Ngo and Jason Hall testified on behalf of the People.

According to Thomas, in March 2023, he was 66 years old. He and Cheryl were experiencing homelessness and lived inside a two-person tent pitched outside a vacant store. They could walk, but each required a wheelchair to travel more than a short distance. One or two months before the incident, Carolus moved next to the couple's tent. Tensions developed between Thomas and Carolus due to spacing disagreements and Carolus's frequent outbursts, during which he would yell at imaginary people or try to talk to Thomas through his tent, sometimes late at night.

On March 26, 2023, around 6:00 p.m., Carolus collapsed Thomas and Cheryl's tent while the couple was inside. Thomas could not see what had happened because the tent fell in his face, but he heard Carolus speaking outside above the tent. After the tent fell, Thomas raised his left hand because he "wasn't sure what was going on," and then felt a sharp object stab his palm twice. He saw a knife go through the tent at least once. The

knife ripped the tent.  Thomas testified that after the attack, the tent had "countless" holes and rips, although his testimony is unclear as to what extent the knife attack caused that damage. Thomas recognized Carolus's voice demanding that he "shut up."

Carolus then struck Thomas on the right side of his head a couple of times with an unknown object and bit him twice through the tent fabric on his right upper arm.  Cheryl got out of the tent.  Thomas tried to do the same, but the broken tent slowed his exit.  Thomas observed Carolus strike Cheryl a couple of times as she fled.  Cheryl asked a bystander to call the police. Outside the tent, Thomas saw Carolus standing approximately 10 feet away.  They exchanged heated words, and Thomas raised an empty milk crate above his head threateningly.  Carolus fled into an alley.  Thomas estimated that the incident lasted five to eight minutes.  The attack "basically" split the tent in half.

Officer Ngo later arrived at the scene.  Ngo documented Thomas's injuries, including a cut to his palm, a contusion on his right eye, and two fresh red bite marks on his right bicep.  The blood on Thomas's hand was "still bleeding a little bit" but otherwise had dried up.  Thomas told Ngo that while he and Cheryl were eating dinner inside the tent, Carolus jumped onto the tent, collapsing it, and threatened to slice Cheryl's throat. Thomas provided officers with a description of Carolus and of the knife, telling them it had a black blade and red handle.

Thomas testified that he saw Carolus a second time that night around 11:00 p.m. and called the police.  When asked to elaborate on what he saw, Thomas testified, "I have to be honest with you.  My vision was pretty bad at th[at] time.  To correct what I said, I didn't actually see him. . . .  But I heard him." Thomas testified that he heard Carolus threatening to "get" him.

4

Officer Hall located Carolus about two to three blocks away from the encampment and directed him to stop. Carolus fled, and Hall arrested Carolus after a brief pursuit. Hall recovered a red folding pocketknife from Carolus's right front pocket. Ngo submitted the knife for fingerprint analysis, but he did not get the results. He did not submit the knife for blood or DNA analysis.

The day after the attack, Thomas sought medical treatment because his eye had swollen shut. Hospital staff bandaged his hand, applied a cold compress to his eye, and referred him to an ophthalmologist. The cut to his hand did not require stitches. Thomas delayed seeking medical attention because he was reluctant to leave Cheryl alone and was concerned about their belongings.

Photographs of the encampment after the attack, the knife, and Thomas's injuries were entered into evidence. The photograph of the knife shows it was eight inches long with reddish-orange handle and a three-inch black sharpened and pointed blade.

2.    *Motion to Dismiss*

Following the close of the prosecution's evidence, the trial court granted a defense motion to dismiss count 2, concerning the alleged assault on Cheryl. The court observed that although Thomas testified to Carolus striking Cheryl, there was insufficient evidence to support the element that great bodily injury was likely. The prosecutor inquired whether she could pursue simple assault as to Cheryl. The court responded there was not enough evidence to do so.

5

### 3. *Defense Evidence*

Carolus did not present any defense case. Rather, his counsel relied on attempting to discredit Thomas's testimony through cross-examination, taking the position that Carolus had done nothing, and Thomas fabricated the entire event. Defense counsel questioned Thomas about three felony convictions from 2014, 2018, and 2020. Thomas did not recall these convictions, although he acknowledged he had pleaded no contest to a felony at some point. Thomas noted he had some memory issues due to concussions, one of which Thomas believed was inflicted by Carolus's attack, and that even before the attack he had difficulty remembering specific details. Defense counsel also asked Thomas about a number of purported inconsistencies in his testimony. For example, Thomas testified at trial that he had lent the knife to Carolus. When Thomas spoke to the police, he did not tell them that the knife belonged to him or that he had loaned it to Carolus. At the preliminary hearing, Thomas testified that he had not given Carolus a knife. When asked about this inconsistency at trial, Thomas suggested he and defense counsel had used the word "give" differently. Additionally, Thomas testified at trial that it was "a little difficult" to describe the knife, that he saw a black blade, that "[he] couldn't see it," and that "after," he saw Carolus "holding a red handle."

### 4. *Closing Arguments*

During closing argument, the prosecutor addressed the crime of assault with a deadly weapon, stating in relevant part, "Jury instruction [CALCRIM No.] 875 lists the [four] elements that the People need to prove beyond a reasonable doubt. Now, first, whether or not a weapon is considered a deadly weapon

6

depends on how the weapon is used. So in considering this charge think about the manner in which the knife was used. Obviously, that's the deadly weapon we're talking about in this case. Consider how the knife was used. First, [Carolus] slashed through the tent multiple times while [Thomas] and [Cheryl] were inside the tent . . . . [Carolus] stabbed through the tent not once but twice to the point that it struck [Thomas] on the hand. The location of the injury is consistent with [Thomas] raising his hand in a defensive gesture trying to protect the vital parts of his body." The prosecutor also explained that although there were inconsistencies in some of Thomas's testimony and that Thomas was the sole witness to testify as to the attack, the photographs of his injuries corroborated his explanation of what occurred.

Carolus's counsel argued Thomas's inconsistent statements about things such as his prior convictions and who owned the knife showed Thomas was a liar and had made up the entire incident. As defense counsel claimed no altercation had occurred, she did not argue that the assault as Thomas described it did not involve a deadly weapon. She argued Thomas knew Carolus would be found with the knife on his person because Thomas had loaned the knife to Carolus. She argued, "how would [Thomas] forget that he gave the assault weapon, the deadly weapon, to my client?" She also argued LAPD failed to properly investigate forensic evidence that would have corroborated whether Carolus had used the knife in the attack. Counsel observed, "So DNA or blood evidence, which would have actually been helpful, was not pursued. I will tell you right now. If they had done that testing and [Thomas's] blood was on that knife, case closed."

5.    *Jury Instructions*

During a pretrial hearing, defense counsel asked for clarification as to which act formed the basis for the assault upon Thomas, noting Thomas had described knife slashing, hitting, and biting.  Counsel noted, "Unless [the prosecution is] going to ask for an instruction on a lesser [included offense].  And then the jury could convict him of a misdemeanor [section] 240 based on the bite. . . .  I can't really defend him unless I know which acts they're seeking to provide beyond a reasonable doubt."  The prosecutor responded that each of the acts were part of a continuous assault.  Neither party requested a simple assault instruction or that the court define the phrase "deadly weapon."

The trial court instructed the jury as to assault with a deadly weapon pursuant to CALCRIM No. 875.  The instruction provided, "The defendant is charged in [c]ount 1 with assault with a deadly weapon other than a firearm in violation of . . . section 245.  [¶]  To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant did an act with a deadly weapon other than a firearm that by its nature would directly and probably result in the application of force to a person; [¶] 2. The defendant did that act willfully; [¶] 3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; [¶] [and] [¶] 4. When the defendant acted, he had the present ability to apply force with a deadly weapon other than a firearm to a person."  The instruction defined "willfully" and "application of force."  The court did not instruct the jury as to the meaning of "deadly weapon" provided in the CALCRIM No. 875 pattern instruction in brackets.

8

The trial court also instructed the jury that "[s]ome words or phrases used during this trial have legal meanings that are different from their meanings in everyday use. These words and phrases will be specifically defined in these instructions. . . . Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings."

### 6. *Jury Deliberations*

During deliberations, the jury asked two questions. First, they asked for the text of section 245. The court responded by referring the jury to the given CALCRIM No. 875 instruction. Second, they asked for Thomas's testimony that Carolus bit him. The court reporter assembled that testimony and, after consulting with counsel, provided it to the jury.

## C. Verdict

The jury found Carolus "guilty of the crime of assault with a deadly weapon, a knife." The jury found not true the allegation that Carolus engaged in violent conduct indicating a serious danger to society.

## DISCUSSION

## A. The Trial Court Did Not Err in Not Instructing the Jury as to Simple Assault

### 1. *General Legal Principles and Standard of Review*

" '[A] trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.' [Citation.]" (*People v. Thomas* (2023) 14 Cal.5th 327, 385.) A lesser included offense is an offense that is encompassed within the charged offense. (*People v. Breverman* (1998) 19 Cal.4th 142, 162, disapproved on another ground in *People v. Schuller* (2023) 15 Cal.5th 237, 260,

9

fn. 7.) A trial court has a duty to instruct on a lesser included offense whenever the evidence would support a reasonable jury in concluding that the defendant is not guilty of the charged offense, but is guilty of the lesser included offense. (*People v. Avila* (2009) 46 Cal.4th 680, 705.) This duty exists whether or not a request is made for a lesser included offense instruction. (*Id*. at p. 704.)

" ' "To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist." ' [Citation.] 'Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense.' [Citation.] 'We review independently whether the trial court erred in rejecting an instruction on a lesser included offense.' [Citation.]" (*People v. Thomas*, *supra*, 14 Cal.5th at p. 385.)

Simple assault is a lesser included offense of assault with a deadly weapon. (*People v. McDaniel* (2008) 159 Cal.App.4th 736, 747-748.) The only difference is that assault with a deadly weapon requires proof the defendant used a deadly weapon. (*Id*. at p. 748.)

" 'As used in section 245, subdivision (a)(1), a "deadly weapon" is "any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury." ' [Citation.]" (*In re B.M.* (2018) 6 Cal.5th 528, 532-533.) Some objects are inherently dangerous or deadly and are therefore considered deadly weapons as a matter of law. (E.g., *People v. Aguilar* (1997) 16 Cal.4th 1023, 1029 [dirks and blackjacks are deadly weapons as a matter of law].) For objects that do not qualify as inherently deadly or

10

dangerous, which include knives, "the object alleged to be a deadly weapon must be used in a manner that is not only 'capable of producing' but also ' "likely to produce death or great bodily injury." ' [Citation.]" (*In re B.M.*, *supra*, at p. 533, italics omitted.)

The application or attempted application of "a sharp object" to "a vulnerable part of the body" establishes a defendant's use of a deadly weapon. (*In re B.M.*, *supra*, 6 Cal.5th at p. 538.) For example, in *People v. Koback* (2019) 36 Cal.App.5th 912, 924-926, the court held that although a car key is not an inherently deadly weapon, its use supported a conviction of assault with a deadly weapon where the defendant " 'charged,' " or " 'came at' " the victim, and, " 'with force,' " " 'swung,' " " 'swiped,' " or " 'punch[ed]' " the key at the victim's torso, a "vulnerable part of the body." Similarly, in *In re D.T.* (2015) 237 Cal.App.4th 693, the court held that a pocketknife was a deadly weapon when it was used to poke the victim in her back because it "could have caused serious injury to the helpless victim." (*Id*. at pp. 696-697, 699-701; see also *People v. Nguyen* (2017) 12 Cal.App.5th 44, 46, 48-49 [substantial evidence supported conviction for aggravated assault where the defendant, wielding a large knife, took a step toward police officers standing 10 to 15 feet away].) In contrast, in *In re B.M.*, our Supreme Court concluded that a butter knife with rounded end was not a deadly weapon where the defendant used moderate pressure in touching the knife to the victim's legs, which were covered with a blanket, and there was no evidence the defendant "stabbed, sliced, or pointed" the knife at an exposed body part. (*In re B.M.*, *supra*, at pp. 535-536.)

2.   *Analysis*

Carolus first argues that because Thomas's hand injuries were minor, the jury could have found that he committed simple assault but not assault with a deadly weapon, thus necessitating a simple assault instruction.

Thomas's lack of serious injury does not constitute substantial evidence that Carolus committed simple assault but not aggravated assault.  " '[A] conviction for assault with a deadly weapon does not require proof of an injury or even physical contact' [citation]." (*In re B.M.*, *supra*, 6 Cal.5th at p. 535.) Rather, the proper inquiry is what harm could have resulted from the manner in which the defendant used the object. (See *id*. at p. 537.)  Here, Thomas testified that Carolus collapsed Thomas's tent (so the tent fabric lay closer to the occupants) and then used a sharp, pointed knife to stab or slash downward into the occupied tent such that he hit Thomas's hand twice.[3]  Carolus's use of the knife in this fashion was capable of producing and likely to produce great bodily injury, even if such injury did not occur.  Carolus did not present any evidence or testimony contradicting this version of events, and, thus, the lesser included instruction was not required.

---

[3] Carolus argues that the People incorrectly describe the number of times Carolus stabbed into the tent as at least twice, contending Thomas testified that "the knife pierced the tent at least once and hit his hand twice."  However, Thomas testified that although he *saw* the knife pierce the tent "at least once," he felt it hit his hand twice.  Thus, the evidence supports the People's interpretation that Carolus stabbed through the tent at least two times.

12

Carolus next argues the jury could have believed that he was merely using the knife to cut into the tent and not to stab any of its occupants. He explains, "With [Thomas] in a vulnerable position in the collapsed tent, even still, it was only when he affirmatively reached up that he was stuck with the knife. In [Carolus]'s superior position over [Thomas] with the knife, he could have easily caused death or great bodily injury . . . the fact that the rest of the assault used only hands, feet, or an unknown other object after [Thomas] reached up and was stuck with the knife is substantial evidence from which a reasonable jury could conclude [Carolus] did not act in a manner *likely* to cause great bodily injury specifically with the knife."

Thomas's testimony describing Carolus's aggressive attack upon him belies Carolus's argument that he used the knife only to cut through the tent. Indeed, Carolus was not deterred from stabbing into the tent after he hit Thomas's hand the first time. Carolus stabbed into the tent at least one more time and hit Thomas again. Moreover, Carolus's argument ignores that slashing into an occupied and collapsed small two-person tent with a sharp, pointed knife is capable of producing and likely to produce great bodily injury.[4]

---

[4] Assault with a deadly weapon is a general intent crime that does not require a specific intent to injure the victim or a subjective awareness of the risk that an injury might occur. (See *People v. Williams* (2001) 26 Cal.4th 779, 788, 790.) "Rather, assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*Id*. at p. 790.) Carolus does not argue that the

Carolus further argues the court should have instructed the jury as to simple assault because the jury could have believed Thomas's testimony that Carolus bit and hit him but not credited testimony that Carolus used a knife. Carolus emphasizes that Thomas's testimony contained inconsistencies. Those inconsistencies, however, related to whether Thomas owned the knife and gave or lent it to Carolus; Thomas consistently testified a knife was used in the attack. Carolus presented no evidence contradicting Thomas's testimony that Carolus used the knife in the manner Thomas described.[5] Mere speculation about what testimony a jury might credit or discount based on a defendant's cross-examination of a prosecution witness is not substantial evidence and is insufficient to require the court to give an instruction of a lesser included offense. (*People v. Williams* (2015) 61 Cal.4th 1244, 1264.)

We therefore conclude the trial court did not err in failing sua sponte to instruct the jury as to simple assault pursuant to section 240.

**B.    Even if Erroneous, the Trial Court's Failure to Instruct the Jury as to the Definition of "Deadly Weapon" Was Harmless Beyond a Reasonable Doubt**

The trial court did not instruct the jury as to the definition of "deadly weapon." A portion of the pattern instruction for

---

prosecution failed to prove that he had the requisite mental state for assault.

[5] Ngo's observation that Thomas's hand had dried blood on it and was still bleeding when he arrived at the scene, as well as the photograph of the hand presented to the jury, corroborated Thomas's testimony about being stabbed in the hand.

14

assault with a deadly weapon states, "A deadly weapon other than a firearm is any object, instrument, or weapon [that is inherently deadly or one] that is used in such a way that it is capable of causing and likely to cause death or great bodily injury.] [¶] An object is inherently deadly if it is deadly or dangerous in the ordinary use for which it was designed. [¶] [In deciding whether an object is a deadly weapon, consider all the surrounding circumstances.]" (CALCRIM No. 875, bracketed phrases in original, italics omitted.) This language was not requested by either party and was not included when the court instructed the jury.

Carolus argues that the failure to provide the above portion of the CALCRIM No. 875 instruction to the jury effectively removed an essential element of the crime from the jury's consideration. He contends he is therefore entitled to appellate review of this issue even though he did not request the instruction in the trial court. (*People v. Mil* (2012) 53 Cal.4th 400, 409 ["no objection is required to preserve a claim for appellate review that the jury instructions omitted an essential element of the charge"].) He further argues the beyond a reasonable doubt harmless error standard of *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct 824, 17 L.Ed.2d 705] should apply to his claim. (See *Neder v. U.S.* (1999) 527 U.S. 1, 9-10, 15-16 [119 S.Ct. 1827, 144 L.Ed.2d 35] [applying the *Chapman* standard to the omission of an element from the jury's consideration].)

To simplify our analysis, we assume arguendo the trial court erred in not providing the jury with the definition of "deadly weapon," that the error effectively removed an element from the jury's consideration, and that we should apply *Chapman* when

15

analyzing this claimed error.  Even so, Carolus is not entitled to reversal because the presumed error was harmless.  Under the *Chapman* standard, "[w]e must determine whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error."  (*People v. Merritt* (2017) 2 Cal.5th 819, 831.)  "[I]n order to conclude that an instructional error ' "did not contribute to the verdict" ' within the meaning of *Chapman* [citation] we must ' "find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record" ' [citation]." (*People v. Brooks* (2017) 3 Cal.5th 1, 70.)

Knives are not inherently deadly weapons.  (*In re B.M.*, *supra*, 6 Cal.5th at p. 533.)  To determine whether a particular knife is a deadly weapon, the trier of fact must consider if it was used as such, which may include consideration of " 'the nature of the object, the manner in which it was used, and all other facts relevant to the issue.'  [Citation.]"  (*Ibid.*)

Here, it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict if the trial court had instructed the jury as to the meaning of "deadly weapon."

First, we observe that whether the knife constituted a "deadly weapon" was not a disputed point at trial.  (See *People v. Aranda* (2012) 55 Cal.4th 342, 367-368 [explaining that whether the omitted element was contested at trial is relevant to determining whether the instructional error was harmless].)  The defense theory was not that Carolus wielded a non-deadly knife; it was that Carolus did not participate in any altercation and did not use any kind of knife.  As noted above, in closing argument, defense counsel conceded that the knife was a deadly weapon and stated if forensic testing has shown Thomas's "blood was on that

knife, case closed." As discussed above, the only witness who testified to the assault, Thomas, stated that Carolus used a sharp knife to stab into an occupied and collapsed tent and did not cease stabbing into the tent even after he struck Thomas. No rational juror would conclude that a knife wielded in this manner was not a deadly weapon. Indeed, on appeal, Carolus concedes, "In [his] superior position over [Thomas] with the knife, he could have easily caused death or great bodily injury."

Carolus argues the lack of instruction and the People's closing argument in which the People offered an "incomplete" definition of deadly weapon permitted jurors to presume the knife was a deadly weapon merely because knives are capable of producing death. We disagree. Consistent with *In re B.M.*, *supra*, 6 Cal.5th at page 533, the People argued to the jury, "Now, first, whether or not a weapon is considered a deadly weapon depends on how the weapon is used. So in considering this charge think about the manner in which the knife was used. Obviously, that's the deadly weapon we're talking about in this case. Consider how the knife was used." Thus, notwithstanding that the court did not define "deadly weapon," the People's closing argument informed the jury that they could not presume it was a deadly weapon without considering the manner in which it was wielded.

Also supporting our conclusion as to the lack of prejudice is that the capability and likelihood of a sharp, pointed knife to cause death or great bodily injury if wielded in a certain manner is well understood by jurors based on their everyday experience. As one court observed, "When . . . the instrument is a knife with an open blade, a special instruction designed to assist the jury in determining whether or not it is capable of causing death is

17

unnecessary.  Nearly all knives have sharp edges and points which are designed to cut things, and knives can be—and all too often are—employed to cut—and kill—people.  Jurors can certainly employ common sense and experience to determine whether or not such a knife is a 'deadly' instrument." (*People v. Pruett* (1997) 57 Cal.App.4th 77, 85-86, italics omitted.)

Here, the trial court instructed the jury that if the instructions did not define certain words, the jury was to use their ordinary, everyday meaning.  As described above, for purposes of section 245, a deadly weapon is " ' "any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury." ' [Citation.]" (*In re B.M.*, *supra*, 6 Cal.5th at pp. 532-533.)  "[I]n commonplace parlance," "[t]he word 'deadly' means 'likely to cause or capable of causing death.' [Citation.]" (*People v. Pruett*, *supra*, 57 Cal.App.4th at p. 85, italics omitted.)  "[A] weapon is 'an instrument of offensive or defensive combat: something to fight with' or 'a means of contending against another.' [Citation.]" (*Id.* at p. 86.)  Thus, the meaning of "deadly weapon" under section 245 and the common understanding of that phrase substantially overlap.

The common and technical meanings of "deadly weapon" do deviate in two ways.  But neither difference supports reversal here.  First, the technical meaning of deadly weapon includes instruments used in a manner capable of producing and likely to produce great bodily injury, not just death.  This difference resulted in no prejudice to Carolus.  To the contrary, the lack of an instruction meant this difference inured to Carolus's benefit, as great bodily injury is less severe than death.

18

Second, the common and legal definitions potentially differ because the technical, legal meaning of deadly weapon links "capable of producing" and "likely to produce" conjunctively. Carolus concedes that even without being instructed, the jury's common understanding of what constitutes a "deadly weapon" would lead it to properly conclude that the knife was "capable of producing" death. He argues, however, that had the court instructed the jury and the People not given an incomplete "definition" of a deadly weapon during their closing argument, the jury would not have found the knife was used in a manner "likely" to cause death or great bodily injury. We disagree. In light of the evidence as to the manner in which Carolus wielded the knife, no rational juror would have found that the knife was not used in a manner likely to cause death or great bodily injury.

Carolus lastly argues that without the definition of "deadly weapon" the jury could have interpreted the four elements of assault with a deadly weapon to conclude that a deadly weapon is one that can apply force that is "merely a 'slight[] touching.'" To reach this conclusion, the jury would have to equate the meaning of "deadly weapon" with the provided definition of "application of force." However, the court instructed the jurors that if a term was not defined, they should use the ordinary, everyday meaning of that term. Thus, there would be no reason for the jurors to attempt to equate these two distinct terms in trying to understand the meaning of the phrase "deadly weapon" regardless of whether the court provided a definition of deadly weapon.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.